FRANK FEHLIG, Appellant, v. BUSCH et al.

Division One, November 19, 1901.

1. **Voluntary Conveyance:** INSOLVENCY: VALIDITY. If the debtor was
not insolvent at the time he conveyed certain real estate, and that
conveyance did not render him insolvent, then it is wholly immaterial
whether he conveyed the property for a valuable consideration or
gave it away, if it was made in good faith and was not fraudulent
in fact. In such case it can not be set aside to pay debts contracted
prior to its execution.

2. ———: PRESUMPTION: REBUTTAL. A voluntary conveyance is not
per se void, but the presumption of fraud may be explained and re-
butted, and this may be done by an examination· into the donor's
comparative indebtedness, or in other words, into his pecuniary abil-

ity, at the time, to withdraw the amount of the donation from his estate without hazard to his creditors, or without in any material degree lessening their prospects of payment.

3. ———: RESULTING TRUST: DEBT TO CHURCH. Where a priest is indebted to a parish for an amount in excess of the value of the lots conveyed to the archbishop for the parish, it can not be said that the conveyance is voluntary. And if in buying the lots thus conveyed and others, the priest used parish money, but took the title in himself, the parish has a resulting trust in the lots for the amount of money used by him, and a subsequent conveyance to the archbishop of a part of the lots, of less value than the parish's money used, will be held not to have been a voluntary conveyance, but the transfer of the title to the beneficial owner.

4. ———: ———: ESTOPPEL: TITLE SHOWN BY RECORD. Where plaintiff at the trial insisted that the maker of a deed, which he claims was voluntary and fraudulent as to him and other creditors, acquired all the property conveyed with his own means, and defendant shows that he had a resulting trust therein because it was acquired by use of his money, plaintiff is not in a position to insist on appeal that defendant (because he permitted the title to stand on the record in the donor and thereby permitted him to acquire credit on the faith of the property) is estopped to assert that he had a resulting trust in the property. An appellant can not be advantaged on appeal by raising issues of estoppel which he did not plead at the trial.

5. ———: SETTING ASIDE: EQUITY: MECHANIC'S LIEN: NO LOSS OF MONEY. Soon after plaintiff began to build a church under a contract with a priest, in whom was the title, the priest conveyed other lots (those in controversy) to the archbishop in trust for the parish. When the work was completed plaintiff obtained judgment for $14,010, general against the priest, and special against the lots on which the church was located, and at execution sale, bought the latter for $500, and sold them soon after to the parish for $10,000; and other lots for $70, worth $9,000, which he still holds. *Held,* that a court of equity will not, under the circumstances, subject the lots conveyed by the priest for the parish to the payment of the difference between his two bids (which amounted to $570) and his judgment of $14,010, because the same principle that prevents a court of law from taking away the fruits of his bargains, prevents a court of equity from lending him any assistance.

Vol 165 mo—10

Fehlig v. Busch.

Appeal from St. Louis City Circuit Court.—*Hon. Jas. E. Withrow,* Judge.

AFFIRMED.

*C. A. Schnake* and *Lubke & Muench* for appellant.

(1)    Plaintiff claims that the evidence shows that this conveyance made Busch insolvent; and it being voluntary on his part, it is void as to the plaintiff as one of Busch's creditors at the time.    Potter v. McDowell, 31 Mo. 62. "It is sufficient in such cases to show that the grantor was in embarrassed or doubtful circumstances, and was not possessed of ample means, outside of the particular property, for the satisfaction of his then existing debts.    When this condition of affairs is proven to exist, the conveyance in question—although none but the purest motives may have prompted its execution—becomes fraudulent in law and is open to the attacks of, and can be successfully assailed by, all who were creditors at the time of the execution of the conveyance, and whose debts remained unliquidated, and incapable of collection in the ordinary course of proceedings."    Patten v. Casey, 57 Mo. 118; Hoffman v. Nolte, 127 Mo. 120; Dunlap v. Mitchell, 80 Mo. App. 393; Eddy v. Baldwin, 32 Mo. 369; State ex rel. v. Koontz, 83 Mo. 323; Snyder v. Free, 114 Mo. 360; Lander v. Ziehr, 150 Mo. 403. (2)    Defendant will claim that there is no evidence actual or presumptive, that the deed in controversy was made with any actual intent to defraud any one; on the contrary that all the facts and circumstances tend to show that Busch was only doing what he thought was right, and that the same was in accordance with the rules of the Catholic church, and under at least a moral obligation towards his congregation.    But a moral obligation, or a secret trust, which may, under circumstances be a good and valid consideration and support a conveyance of real estate, will not be such if rights of creditors

have intervened, or if such conveyance hinders or delays a creditor in the collection of a prior claim. St. George's Church Society v. Branch, 120 Mo. 226; Patten v. Casey, supra; Hoffman v. Nolte, supra; Dunlap v. Mitchell, supra; Bump on Fraud. Conv. (4 Ed.), sec. 243, p. 282. The deed being voluntary and without any pecuniary consideration moving from the grantee, it was void as to all existing creditors of the grantor. Jordan v. Buschmeyer, 97 Mo. 94; Lander v. Ziehr, 150 Mo. 403. (3) The validity of a voluntary conveyance depends upon the intent of the party making it, and not on the motive with which it was received. The proviso at the end of the statute only extends to transfers made upon a good consideration, and the only consideration which is good within the meaning of the statute is a valuable consideration. It is the innocent purchaser, and not the innocent donee, that is protected. It is the motive of the giver, and not the knowledge of the acceptor, that is to determine the validity of the transfer. Bump on Fraud Con. (4 Ed.), sec. 239, p. 280; Gamble & Johnson v. Johnson, 9 Mo. 605; St. George's Church Society v. Branch, 120 Mo. 245. (4) There is no evidence in the record upon which plaintiff is estopped from averring that the conveyance to Archbishop Kenrick was fraudulent as to him. Nor is there any evidence tending to show that Fehlig, by his words or conduct, willfully caused Father Huettler, or the defendant corporation, to believe the existence of a certain state of things, and induced them to act on that belief so as to alter their previous position. Johnson-Brinkmann & Co. v. Railroad, 126 Mo. 345; Newman v. Hook, 37 Mo. 207; Taylor v. Zepp, 14 Mo. 482; Brinkerhoff-Faris T. Co. v. Horn, 83 Mo. App. 114. The act, to operate an estoppel, must have been done with the intent that the other party should act upon it, and the latter was induced thereby to change his condition or relation to the subject-matter thereof to his injury. Brinkerhoff-Faris T. Co. v. Horn, supra; Burke v. Adams, 80 Mo. 504; Eitelgorge v. Home Bldg. Ass'n., 69 Mo. 52; Noble v.

Blount, 77 Mo. 235; Acton v. Dooley, 74 Mo. 63; State v. Billington, 51 Mo. App. 252; Reichla v. Gruensfelder, 52 Mo. App. 43.   (5)  To make a matter *res adjudicata* there must be a concurrence of four conditions, viz.: First, identity of the subject-matter; second, identity of the cause of action; third, identity of the persons and parties; fourth, identity in the quality of the persons for or against whom the claim is made. Plaintiff submits that there is no identity of "the subject-matter;" secondly, no "identity of the cause of action." And he also submits that the judgment in the cause pleaded as a bar was not recovered on the real foundation of the present action, and not upon a full and complete hearing and determination of the merits thereof, but upon a matter foreign thereto.   Winham v. Kleine, 77 Mo. App. 36; Garrett v. Greenwell, 92 Mo. 120; Short v. Taylor, 137 Mo. 519; Baker v. Lane, 137 Mo. 682; Dickey v. Heim, 48 Mo. App. 114; Clemens v. Murphy, 40 Mo. 121; Spradling v. Conway, 51 Mo. 51.

*Daniel Dillon* and *Henry S. Shaw* for respondent Holy Ghost Parish Association.

(1)  Even if the conveyance of April 8, 1892, by Michael Busch to Peter Richard Kenrick, of lots 21, 22, 23, 24, 25 and 26 was without consideration, it could not, under the circumstances, be held to be fraudulent, and plaintiff would have no grounds on which to ask to have it set aside.   Walsh v. Ketchum, 84 Mo. 427; Updegraff v. Theaker, 57 Mo. App. 45.   (2)   (a)  The conveyance of April 8, 1892, by Busch to Kenrick was not voluntary.   Bangs Milling Co. v. Burns, 152 Mo. 376; Schroeder v. Bobbitt, 108 Mo. 289, 293, 294; Ames v. Gilmore, 59 Mo. 543;  (b)  The evidence clearly shows that Father Busch held the legal title to the lots conveyed by him to Archbishop Kenrick by the deed of April, 1892, in trust for the Holy Ghost Parish; that they were bought with the money of the parish and were bought for the

parish, and that the conveyance of them to Archbishop Kenrick was in pursuance of the purpose for which they were bought. Where the property conveyed was purchased with the money of the grantee, or where, for any reason, the property is held by the grantor in trust for the grantee, or where, under the facts, a court of equity would compel the grantor to convey the property to the grantee or to some one for the use of the grantee, then the conveyance can not be impeached as fraudulent or voluntary. Bump on Fraudulent Conveyances (4 Ed.), sec. 202, p. 230; Am. and Eng. Ency. of Law, (2 Ed.), p. 258; Payne v. Twyman, 68 Mo. 339; Wherry v. Hale, 77 Mo. 20; Erwin v. Holderman, 92 Mo. 333; Dozier v. Matson, 94 Mo. 333; Aultman v. Booth, 95 Mo. 383; Dougherty v. Horsel, 91 Mo. 161; Coffee v. Smith, 101 Mo. 229; Desmond v. Myers, 113 Mich. 437; Seeders v. Allen, 98 Ill. 468; Manix v. Purcell, 46 Ohio St. 102. (3) The declarations, statements and actions of plaintiff when he sold lots 24 and 25 to this respondent estop him from setting up any claim to or against or any interest in lots 21, 22, 23 and 26. "Where a party by his acts or words causes another to believe in the existence of a certain state of things and induces him to act on that belief so far as to alter his own previous condition, he will be concluded from averring anything to the contrary against the party so altering his condition." Chouteau v. Goddin, 39 Mo. 250; Garnhard v. Finnerty, 40 Mo. 462 & 463; Reynolds v. Kroff, 144 Mo. p. 447; Huntsucker v. Clark, 12 Mo. 339; Taylor v. Zepp, 14 Mo. 482; Taylor v. Elliott, 32 Mo. 172; Rice v. Bunce, 49 Mo. 231; Moore v. Bank, 52 Mo. 377; Schenck v. Sautter, 73 Mo. 46; Guffey v. O'Rielley, 88 Mo. 418; Longworth v. Aslin, 106 Mo. 155; Bank v. Frame, 112 Mo. 513. (4) Aside from the three specific points already set out, the evidence shows that there is no equity in the claim of plaintiff as against this defendant. "A party in a court of equity, who asks to have his own equitable rights enforced and a conveyance annulled which he in-

sists is unconscionable and fraudulent, must, by clear and undubitable evidence, show that he has superior equity to all against whom he seeks relief.   If he invokes the aid of a court of equity he must not ask to have superior equity set aside to let him into the relief sought." Bump on Fraudulent Con. (4 Ed.), sec. 575, p. 560; Preston v. Turner, 36 Iowa, 671; Story's Eq. Jur. (13 Ed.), sec. 640, p. 63; Van Wyck v. Seward, 6 Paige Ch. 62; Gottlieb v. Thatcher, 34 Fed. Rep. 440.

MARSHALL, J.—This is a bill in equity to subject lots 21, 22, 23 and 26 and a strip fifteen feet wide by about one hundred and forty feet long lying east of lot 23, in city block 3719 of the city of St. Louis, to the payment of the balance of some fourteen thousand dollars alleged to be due on a judgment in favor of the plaintiff and against the defendant Busch.   The judgment of the circuit court was in favor of the real defendant, the Holy Ghost Parish Association, and the plaintiff appealed.

The material averments of the pleadings and the substance of the facts shown on the trial are so fairly and clearly stated by attorneys for the respondent, the Holy Ghost Parish Association, that it is a real pleasure to adopt their statement.

That statement when read in connection with the following plat of the premises referred to in the statement, make the controversy in this case very plain.

The plat is as follows:

Fehlig v. Busch.

The statement of respondent's attorneys is as follows:

## "STATEMENT.

"In his petition plantiff alleges, in substance, that in January, 1892, he entered into a contract with defendant Busch for the erection of the rock foundation of a church

building, and that thereafter, under this contract, he erected said foundation, and being unable to get his pay for his work he commenced suit against said Busch and John J. Kain, who at the time held title to lots 24 and 25 of block 3719 of city of St. Louis, being the ground on which the foundation was erected; and that in December, 1895, he recovered a judgment for $14,010, general against said Busch, and special against said lots, establishing a mechanic's lien against them; and that he caused execution to be issued against said Busch under which he levied upon and sold all the property of said Busch that could be found, and that he also caused said lots 24 and 25 to be sold under said judgment establishing said mechanic's lien; and after applying the proceeds of these sales there remained unpaid of said judgment $13,593.24; and that on April 8, 1892, said Busch, without consideration, conveyed lots 21, 22, 23, 24, 25 and 26 in said block and a strip of ground fifteen feet wide to Peter Richard Kenrick; that by said conveyance said Busch became insolvent and the same was a fraud on plaintiff; that afterwards the title of said Kenrick, by decree of court, became vested in John J. Kain, who afterwards on February 20, 1897, without any consideration conveyed said lots 21, 22, 23 and 26 and said strip to the Holy Ghost Parish Association, a corporation. The petition then alleges that by reason of the premises said lots 21, 22, 23 and 26, and said strip were and are in equity the property of said Busch and subject to the lien of said judgment. The prayer is that said conveyance of April 8, 1892, from said Busch to said Kenrick, be declared fraudulent as to plaintiff, and that said subsequent conveyances from said Kenrick to Kain and from Kain to said parish association be set aside, and that said lots be subjected to the payment of said judgment and for general relief.

"The answer of the Holy Ghost Parish Association admitted that it was a corporation, and admitted the making of the conveyances mentioned in the petition, but denied all other

averments, allegations and conclusions in the petition con-
tained.    The answer then alleged specifically, in substance,
as follows:

"First.    That at the time of the conveyance from said
Busch to Kendrick, said Busch was solvent and was the owner
in his own name of unincumbered real estate of the value of
$20,000, and of other real estate of the value of $4,000 in-
cumbered for $1,500, and of personal property of the value of
$5,000; and that he continued to be such owner and held said
property in his open and exclusive possession till July, 1894,
and that said Busch during this time was single and unmarried
and not entitled to any exemption.

"Second.    That in 1879 said Busch became pastor or
rector of the parish of the Holy Ghost, an unincorporated
religious congregation or society in the city of St. Louis, and
remained such pastor till 1896; and from 1879 till April 5,
1892, said Busch as said pastor received from said congrega-
tion large sums of money aggregating more than $25,000, to
be expended for said congregation in promoting its welfare
and providing suitable accommodations for religious worship;
and that said Busch did not apply said moneys as directed and
intended by said congregation, but converted a large part of
same to his own gain and profit, and that said Busch in part
payment and restitution of said moneys so diverted by him,
conveyed said lots to said Kenrick, who was then archbishop of
the diocese of St. Louis, in trust for said congregation, and that
said Kain became the successor of said Kenrick as archbishop,
and held said lots subject on same trusts; and in execution of
said trust and at the request of said congregation conveyed said
lots to said Holy Ghost Parish Association, which is composed
of the same persons, with others, who contributed said moneys
to said Busch as aforesaid; and that said lots so conveyed by
said Busch were not worth at the time of said conveyance as
much as the amount of the indebtedness of said Busch to said
congregation.

"Third.    That under his said judgment against said Busch, plaintiff had caused to be levied on, and sold as the property of said Busch, lots 2, 3, 4 and 5, and lots 12, 13 and 14 of said block, and at said sale had bought said lots at unconscionably low and inadequate prices, aggregating only $70, whereas they were worth, in excess of all incumbrance on them, the sum of $8,830.    And that under his mechanic's lien judgment he caused said lots 24 and 25 to be sold with the improvements thereon and bought the same for $500, whereas they were worth $10,000, and plaintiff afterwards sold them to this defendant for $10,000 cash, and that plaintiff has received out of the sales of said property an amount in excess of his said judgment against said Busch.

"Fourth.    That after plaintiff had bought said lots 24 and 25 under execution against said Busch as aforesaid, viz., in 1897, this defendant bought of plaintiff said lots 24 and 25 for the sum of $10,000 cash; that said lots 21, 22 and 23 and said strip lie immediately in the rear of lots 24 and 25, and lot 26 adjoins lot 25 on the north, and this defendant did not want and would not buy lots 24 and 25, or either of them, unless it also owned said lots 21, 22 and 23 and 26 and said strip.    And plaintiff, for the purpose of inducing and influencing this defendant to buy said lots 24 and 25, assured this defendant that it had good title to said lots 21, 22 and 23 and 26 and said strip.    There was at that time a deed of trust covering said lots 21, 22 and 23, and also some lots owned by plaintiff, and there was a suit pending between this defendant and plaintiff to determine how much of said deed of trust was a charge on said lots 21, 22 and 23, and when this defendant bought of plaintiff said lots 24 and 25 plaintiff said to defendant he would abide the judgment of the circuit court in that suit; and that when said lots 21, 22 and 23 should be freed from said deed of trust this defendant would have a perfect title to said lots 21, 22 and 23 and 26 and said strip.    And that relying on said statements of plaintiff and influenced thereby,

this defendant bought said lots 24 and 25 of plaintiff and paid. him therefor $10,000. And this defendant would not have bought said lots 24 and 25, or either of them, if it had known that plaintiff had or made any claim on or against said lots 21, 22, 23 and 26 and said strip, or any of them, except the claim under said deed of trust. And that plaintiff is in equity and good conscience estopped from setting up the claim and demand against lots 21, 22, 23 and 26 and said strip, set out in his said petition.

"Fifth.    That in 1890 said Busch conveyed said lots 21, 22 and 23 and other lots, by deed of trust, to secure payment of a note for $6,000. And in March, 1897, said lots 21, 22 and 23 were advertised for sale under said deed of trust. And this defendant began an action in the circuit court of the city of St. Louis against Frank Fehlig and Theodore Fehlig, and in its petition in said action this defendant alleged that it was the owner of said lots 21, 22 and 23, and set out the conveyances of same from said Busch to said Kenrick, and from said Kenrick to said Kain, and from Kain to this defendant. And in said petition this defendant further alleged that said Frank Fehlig had bought the other lots covered by said deed of trust, and that said Theodore and Frank had conspired to have the whole amount of said deed of trust made out of lots 21, 22 and 23, owned by this defendant. Said Frank and Theodore Fehlig appeared and filed answers to said petition, and therein admitted that this defendant was the owner of said lots 21, 22 and 23. And a trial of said action was had and a final decree rendered, in which it was found that this defendant owned said lots 21, 22 and 23, and that they were subject to a lien under said deed of trust for the sum of $435.75, and that on the payment of said sum into court within thirty days said lots should stand released from said deed of trust. And this defendant did pay into court said sum within thirty days. And that Frank Fehlig appealed from said decree to St. Louis Court of Appeals, which affirmed said decree, and that Frank

Fehlig was the real owner of said note secured by said deed of trust when said decree was rendered and when it was affirmed. And that said decree and proceedings are a bar to this suit so far as lots 21, 22 and 23 are concerned.

"The reply to the answer of the Holy Ghost Parish Association was a general denial.

"At the trial, when this defendant began to inquire as to what property Michael Busch owned when he made the conveyance of lots 21, 22, 23, 24, 25 and 26, to archbishop Kenrick (this is the conveyance alleged by plaintiff to be without consideration, and fraudulent), the following occurred: 'Mr. Schnake (counsel for plaintiff) : Plaintiff admits that Mr. Busch at that time was in solvent circumstances, that he was worth at that time $20,000; I object to going into this matter now; they can not contradict their own answer.' Mr. Dillon (counsel for the defendant) : 'Do you admit it ?' Mr. Schnake: 'I admit that the time the deed was made Father Busch was worth $20,000 in real estate and personal property, as alleged in defendant's answer, in his own name.' The Court: 'In his individual right ?' Mr. Schnake: 'In his individual right; just as they state in their answer.' Mr. Dillon: 'By that you mean the deed made in April, 1892 ?' Mr. Schanke: 'By that I mean exactly as you have set it forth in your answer.' Upon this admission being made and noted, defendant ceased to make further inquiry in regard to this point, and offered no evidence bearing on it, except to show that Father Busch was never married.

"The allegations in the answer, referred to in above admission, are that at that day, and a long time previous, Michael Busch was solvent and the owner of real estate, unincumbered and free from any liens, of the value of $20,000, and of other real estate of the value of $4,000, on which was an incumbrance of $1,500, and of personal property of the value of $5,000, and that he continued to be such owner, and held open possession of the same, until July 17, 1894, and that he was

unmarried and entitled to no exemptions.

"Defendant Busch made no defense, and was the main witness for plaintiff.    He was examined and cross-examined at length.    The testimony shows that Michael Busch is a Catholic priest, and that he was placed in charge of the Holy Ghost parish in St. Louis in 1879.    He at that time had no means of his own, except a couple of hundred dollars.    He received collections and donations from his parishioners, and soon bought 150 feet on North Market street, known as lots 6, 7, 8, 9, 10 and 11.    These were bought in the name of P. J. Ryan, who was assistant to Archbishop Kenrick (Ryan afterwards transferred the title to these lots to Kenrick). From contributions and donations of the parishioners in money and material a building was erected on these lots, the lower part of which was used for a school and the upper part for a church.    Father Busch collected large sums of money every year, not only from pew rent, and Sunday collections and other collections in the church, but from festivals and picnics and from parish societies; and a special collection was taken up in 1885 amounting to $1,800 or $1,900.    A great number of the parishioners were examined as witnesses on this point by this defendant, and the substance of their testimony is set out in plaintiff's abstract.    Though required by the rules of the church to do so, Father Busch kept no account of the moneys received by him or of the disposition he made of them.    Lots 12, 13 and 14 were bought and the title taken in the name of Michael Busch ; on these were erected a house for the Sisters to live in who taught the parochial school.    Afterwards, lots 2, 3, 4, and 5, which front on Taylor avenue, were bought by Father Busch and the title taken in his own name, and on lots 2 and 3 a large brick residence for the pastor was erected, costing over $5,000.    In 1885 Father Busch for $12,000 bought a tract of four acres which adjoined on the south the ground he already had.    He took the title in his own name.    The cash payment was $4,000 which he raised by means of a mortgage

executed by Archbishop Kenrick on lots 6, 7, 8, 9, 10 and 11 and a deed of trust executed by himself on lots 12, 13 and 14. The four acres he subdivided into lots. He sold two of these to different persons and then sold all of the rest (except lots 21, 22, 23, 24, 25 and 26) to a man named Terry for $15,000 or $16,000, realizing in all about $17,000 or $17,500 for these lots; out of this sum he paid the $8,000 which was owing on account of the original purchase of these lots and the interest due on same. Of the balance he can give no account except to say he paid it out for debts contracted on account of the parish, but he can specify none of these debts. He never paid off either of the deeds of trust by which he raised the $4,000 to make the first payment on account of the four acres. Lots 21, 22, 23, 24, 25 and 26, are a part of that four-acre tract. These are the lots conveyed by Busch to Kenrick by the deed in trust dated April 8, 1892, and which is attacked in this suit as being without consideration and fraudulent.

"In 1890 Father Busch, and three other gentlemen with whom he was associated in mining ventures, executed a note on which Father Busch says he borrowed $6,000 from the Lafayette Bank to pay the debts of the parish. This note Father Busch took up by giving his own note secured by a deed of trust dated April 18, 1890, covering lots 2, 3, 4 and 5, and 12, 13 and 14, and 21, 22, 23, 24, 25 and 26. He says he borrowed this money to pay debts of the parish, but he can not specify any of the debts, and the evidence shows that this money was not borrowed for the parish but was borrowed to be used in some mining business, in which Father Busch and the other gentlemen were engaged at that time. We will allude to this testimony more fully in another place. Father Busch paid off a part of this $6,000 and had released from this deed of trust lots 2, 3, 4 and 5, and lots 24, 25 and 26, leaving a balance of $2,153 unpaid and a lien on lots 12, 13, 14, and 21, 22, and 23. This balance he never paid. On the eighth of May, 1890, Father Busch placed a deed of trust on

lots 24, 25 and 26 to secure his principal note at two years for $1,500 and four interest notes of $45 each. These notes he never paid. And he makes no statement as to what he did with the money received for these notes. Some time before 1890 (witness Neumann testified he bought stock in the Whalen mine in 1888 or 1889) Father Busch began to invest in mining stocks and became interested in mining ventures. For some reason he did not want to tell about these matters, and it is evident that he did not make a full disclosure of all his dealings along these lines. When first asked, he said he did not get into stock transactions. When pressed, he said he bought a little stock, and when asked what he meant by a little he said a couple of hundred dollars' worth. On further cross-examination he admitted that he had bought one hundred shares in the Whalen mine for which he paid $2,500 cash, and that he had several thousand shares in a placer mine in which he had invested from $300 to $500, and that he· had invested about $1,000 in a lead mine known as Future Great, and that he was one of the promoters and had helped to organize an aluminum company. That he had more extensive dealings of this nature and had invested more money in these enterprises is evident from his manner of answering and from the testimony of other witnesses. Bernard Newmann, who was secretary of the Whalen mine, says, that, according to his recollection, Father Busch had from 150 to 200 shares for which he paid $25 a share. Daniel Lavery testified that he sold Father Busch thirty shares in the St. Peters mine (Whalen mine) for $900. Frank Koers testified that Father Busch had persuaded him to buy shares in a placer mine and that Father Busch was one of the principal stockholders, holding from 30,000 to 50,000 shares, and that they wanted.to raise money to put in machinery, and pipes, and that they wanted him to indorse a note in order to raise $5,000 or $6,000 for that purpose, and that he refused to indorse. And that they had a mine in Missouri with the ore of which Dr. Zwarts was

experimenting, and that they had three or four car loads of ore which Father Busch and Dr. Zwarts were trying to sell. That Father Busch said they had machinery there, and washers and an irrigating process, and that a good many thousand dollars had been spent on it and that they were working at the mine, etc. In this connection we may properly refer again to the note for $6,000, which was made in 1890 by Father Busch and Dr. Zwarts and two other gentlemen associated with him in mining matters and which was discounted at the Lafayette Bank and which Father Busch afterwards took up by giving his own note for $6,000, dated April 18, 1890, secured by a deed of trust on lots 12, 13 and 14, and 2, 3, 4 and 5, and 21, 22, 23, 24, 25 and 26. Father Busch said this money was borrowed to pay parish debts, but it is evident that this is not so. He does not attempt to say what the debts were, though closely questioned. Dr. Zwarts and the other gentlemen on the note did not live in that parish at all and had nothing to do with it. Father Busch said that it was the understanding when this money was first got from the bank that the deed of trust should be given. If the money was borrowed for the parish there was no occasion to raise it first on a note made by Busch, Zwarts and others, and afterwards take this note up with the deed of trust. If the money was borrowed for the parish it would have been borrowed in the first instance on the deed of trust. Besides, Busch says that Zwarts got the money from the bank on the first note. He did not live in the parish, and was not connected with it. It was unnatural that he should have received the money from the bank and not Father Busch, if it was borrowed for Father Busch's parish. A person would be too credulous for practical purposes who would believe under this evidence that the money was borrowed and used for the Holy Ghost parish. Certainly, the trial judge was warranted in finding that it was not borrowed or used to pay the debts of that parish. As has been said before, $2,153 of this loan was unpaid, and a lien on lots 12, 13, and 14 and

lots 21, 22 and 23, in April, 1892, when Busch made the conveyance complained of to Kenrick, and this debt was never paid by Busch or any one for him.

"About January, 1892, Father Busch, without consulting any one, determined to build a large church on lots 24 and 25, and to that end contracted with plaintiff for the erection of the rock work of the basement. On the eighth of April, 1892, and before work had been commenced on the basement, but after plaintiff had had some material delivered on the ground, Father Busch conveyed by warranty deed lots 21, 22, 23, 24, 25 and 26 to Archbishop Kenrick. (This is the conveyance attacked in this suit.) Plaintiff completed his work in the fall of 1892, and took the individual note of Michael Busch for the price; this not being paid, plaintiff filed his mechanic's lien for $12,660 against lots 24, 25 and 26 on the seventeenth of February, 1893, and afterwards began a suit in the circuit court against Busch and Peter Richard Kenrick and John J. Kain, asking for a judgment against Busch and the establishment of a mechanic's lien against lots 24, 25 and 26, and on December 2, 1895, he recovered a judgment against Busch for $14,010, and also a judgment establishing his mechanic's lien against lots 24 and 25, which were found and adjudged to be owned by John J. Kain. Under an execution issued on said judgment, plaintiff caused to be levied on and sold, as the property of Busch, lots 12, 13 and 14, and lots 2, 3, 4 and 5, and bought them himself at the sheriff's sale for mere nominal prices, aggregating $70. He also caused lots 24 and 25, on which he had erected the rock basement, to be sold under execution issued on the judgment giving him a mechanic's lien, and bought them himself for $500. On lots 2 and 3 stands what is called the priest's house, a large two-story brick, which cost over $5,000 to build, and while plaintiff bought lots 2, 3, 4 and 5 at the sheriff's sale for $50, the evidence shows they were worth over $12,000 subject to a deed

of trust for $7,000, leaving their worth in excess of the incumbrance at least $5,000. Plaintiff bought lots 24 and 25 (on which was the basement of the new church) at the sheriff's sale for $500. But the evidence shows that they were worth more than $10,000. Plaintiff's bill for the work he had done on this basement was $12,560, and there was $3,000 worth of other work on it, besides the value of the ground. Plaintiff afterwards sold these lots to this defendant for $10,000. There was a deed of trust on lots 24, 25 and 26 for $1,500. The part chargeable to lots 24 and 25 would be about $1,000, so that lots 24 and 25 were worth more than $9,000, over all incumbrances. Plaintiff bought lots 12, 13 and 14, on which stands the Sisters' house, for $20. But they were worth considerably more than the incumbrances on them. Plaintiff collected over $700 in rentals, and then refused to rent any longer to defendant and forced them to vacate and the property became vacant. It is evident that plaintiff had property enough to satisfy his debt if he had sold it at reasonable prices. But he insisted on high prices and evidently wanted to make something out of it. He wanted to sell the whole of it to defendant for $30,000, when defendant was not able to pay for and did not want the whole of it. In 1896, after the property had been bought by plaintiff under his execution, Father Huettler was placed in charge of the Holy Ghost parish, and he and some of the parishioners began to negotiate with plaintiff to buy back some of the property; they offered him $19,000 for lots 12, 13 and 14 and for the basement and for the release of deeds of trust on 21, 22, 23 and 26, that is, lots 12, 13 and 14, and 21, 22 and 23, and 24, 25 and 26 were to be clear of incumbrances. These incumbrances amounted to about $5,000. The offer was not accepted, plaintiff wanting $20,000. About the beginning of 1897 the Holy Ghost Parish Association was incorporated and Archbishop Kain conveyed to it lots 21, 22, 23 and 26. In March, 1897, Theodore Fehlig, claiming to be the owner of the notes secured by the deed

of trust on lots 12, 13 and 14 and on lots 21, 22 and 23, executed a deed to Frank Fehlig, releasing lots 12, 13 and 14 and advertised lots 21, 22 and 23 for sale under the deed of trust. Said Theodore, also claiming to be the owner of the note secured by the deed of trust covering lots 24, 25, and 26, executed a deed of release to Frank Fehlig of lots 24 and 25 and advertised lot 26 for sale under the deed of trust. The Holy Ghost Parish Association brought suit against Theodore Fehlig and Frank Fehlig and the trustees to have determined how much of the deed of trust remained a charge on lots 21, 22 and 23, since lots 12, 13 and 14 had been released, and enjoining the sale in the meantime. And a similar suit was brought enjoining the sale of lot 26. The first of these suits was tried by the circuit court before Judge Flitcraft and taken under advisement. Soon after this, the parish association, through its officers and Father Huettler, began again to negotiate with plaintiff. The outcome of these negotiations was that the parish association bought of plaintiff lots 24 and 25 (on which is the basement of the new church) for $10,000 cash, and received from him a warranty deed. Lot 24 is on the northwest corner of Taylor avenue and Garfield avenue and runs back west along north line of Garfield avenue about 135 feet. Lot 25 fronts Taylor avenue and adjoins lot 24 on the north. Lot 26 fronts Taylor avenue and adjoins lot 25 on the north. Lot 23 fronts on Garfield avenue with a depth northward of 138 feet and is west of west end of lots 24, 25 and 26. Lot 22 is west of 23, and 21 is west of 22. When the lots were first laid out there was an alley fifteen feet wide running north and south and separating the west end of lots 24, 25 and 26 from lot 23. This alley was afterwards vacated and this is the strip fifteen feet wide so frequently mentioned. The parish association had already acquired lots 21, 22 and 23, and 26, by a deed from Archbishop Kain, and by acquiring lots 24 and 25 they would have a compact and contiguous body of land fronting 138 feet on Taylor avenue by a depth of 205

feet on north line of Garfield avenue. The parish asso-
ciation would not buy lots 24 and 25 except they owned
lots 21, 22 and 23, and 26. In negotiating to sell lots 24 and
25 plaintiff made no claim to lots 21, 22, 23 and 26 or any of
them except the claims based on said deed of trust. On the
contrary, he told the representatives of the association, when
they said that $10,000 was too much for lots 24 and 25, that
they could afford to pay that price as they already owned the
adjoining lots, viz., 21, 22 and 23, and 26. He told them
that he would abide the decision of the court as to the amount
of the deeds of trust that should be charged on lots 21, 22 and
23, and 26, and would not appeal, and that when that was
settled their title to lots 21, 22 and 23, and 26 would be clear.
In building the basement, it was built partly on this fifteen-
foot strip, and when the association was buying from plaintiff
lots 24 and 25, Father Huettler wanted to know if the pur-
chase included this strip, and plaintiff's lawyer, in the pre-
sence of plaintiff, said, in substance, it made no difference;
that the association already owned lots 21, 22 and 23, which,
with lots 24 and 25, carried the strip. The lawyer of the
association, who was also present, said the same thing in the
presence of plaintiff and his lawyer. And on these repre-
sentation and assurances the association purchased lots 24 and
25. Judge Flitcraft afterwards decided the case in reference
to the amount of the deeds of trust, which was a lien on lots 21,
22 and 23, holding that these lots were to be charged with the
sum of $448.55. Frank Fehlig was dissatisfied with this
judgment and appealed to the St. Louis Court of Appeals,
which affirmed the judgment. The result of that suit seems
to have angered Frank Fehlig and caused him to commence
this suit.

"In the suit tried before Judge Flitcraft and referred
to in the pleading and evidence, the Holy Ghost Parish Asso-
ciation was plaintiff and Frank Fehlig and Theodore Fehlig
were defendants. The petition in that case alleged that the

association was the owner of lots 21, 22 and 23, having acquired them by mesne conveyance from Peter Richard Kenrick, who acquired them from Busch under this deed of April 8, 1892. The decree of the court found that the association was the owner of said lots and that they were subject to the payment of $448.55 by virtue of a deed of trust held by Theodore Fehlig, and that on the payment of that sum into court for said Fehlig the lots should stand released from said deed of trust. The sum of $448.55 was paid into court by said association in accordance with that decree. The evidence at the trial of this case shows that that deed of trust really belonged to Frank Fehlig."

## I.

The plaintiff contends that the conveyance of the premises here involved by Busch to Archbishop Kenrick was purely *voluntary,* and without consideration, and, hence, is void in law, however devoid of fraudulent intent it may have been as to the plaintiff, because he was a creditor of Busch at that time.

This conveyance was made April 8, 1892. At that time the plaintiff admitted in open court, at the outset of the trial, that Busch was solvent and the owner of real estate, unincumbered and free from any liens, of the value of $20,000, and of other real estate of the value of $4,000 on which there was an incumbrance of $1,500, and that he also owned personal property of the value of $5,000, and that he was unmarried and not entitled to any exemptions. Thus, at that time Busch is conceded to have been worth $27,500 in real and personal property. At that date he had made a contract with the plaintiff to build the foundation for a church on lots 24 and 25, and the plaintiff had entered upon the performance of his contract and had some building materials on the ground, but had done no work. Afterwards, he finished the contract, and on December 2, 1895, he obtained judgment against Busch for

$14,010. The premises in controversy were unimproved and were worth only the value of the land, and were subject to their proportion of a deed of trust which was afterwards adjudged to amount to $435.75, which the defendant association paid, about the year 1897, to the plaintiff who had acquired the deed of trust. The plaintiff, however, contends that the conveyance of these premises by Busch to Archbishop Kenrick so stripped Busch that it rendered him insolvent, and therefore that conveyance must be treated as voluntary and without consideration, and, hence, void in law. The evidence does not support this contention. The only unsecured indebtedness of Busch shown to have existed at that time was his liability to plaintiff on a contract just begun to be performed. But assuming that Busch's liabilities were then the full amount of the judgment the plaintiff afterwards recovered against him in 1895, to-wit, $14,010, and deducting this sum from his conceded worth at that time, to-wit, $27,500, and it would leave Busch the owner of real and personal property over and above his liabilities of the value of $13,490, which was subject to execution. On this showing it is beyond dispute that Busch was solvent when he made the conveyance of these premises, in 1892, to Archbishop Kenrick. This being true, it can not be that the conveyance of this property made him insolvent, and if it did not have this effect then the plaintiff's major premise falls and his contention fails. If Busch was not insolvent and this conveyance did not render him so, then it is wholly immaterial whether he conveyed this property for a valuable consideration or gave it away, for it is not denied that the conveyance was made in good faith and was not fraudulent in fact. "The presumption of an intent to delay, hinder and defraud creditors arising from a voluntary conveyance by a person who is in debt is not conclusive, for such a conveyance is fraudulent only when it necessarily delays, hinders or defrauds them. . . . The true rule by which the fraudulency or fairness of a voluntary conveyance is to be ascertained in this

respect, is founded on a comparative indebtedness, or in other words, on the pecuniary ability of the donor at the time to withdraw the amount of the donation from his estate without the least hazard to his creditors, or in any material degree lessening their then prospects of payment." [Bump on Fraud. Conv. (4 Ed.), pp. 285 and 286.] This rule received express sanction by this court in Walsh v. Ketchum, 84 Mo. 1. c. 430, and it was there held that such conveyances were not per se void, but that the presumption of fraud might be explained and rebutted, following in this respect the rule laid down by the Supreme Court of the United States in Lloyd v. Fulton, 91 U. S. 479, and the earlier cases in this State. This rule was also approved in Snyder v. Free, 114 Mo. 1. c. 369, and in Hoffman v. Nolte, 127 Mo. 1. c. 135, although the facts in those cases were such that the conveyance was held to be presumptively fraudulent.

The result is that the plaintiff's contention must fail, even if the conveyance be treated as voluntary and without consideration.

But the record does not bear out the plaintiff's contention that the conveyance was without consideration. The facts disclose that in 1879 Busch became the pastor of Holy Ghost parish. At that time he owned only two hundred dollars' worth of property. Thereafter he received, in his capacity of pastor, donations and collections for parish purposes, one special collection in 1885, amounting to some eighteen hundred dollars. Soon after he became pastor he purchased lots 6, 7, 8, 9, 10 and 11, and had the title placed in the name of P. J. Ryan, the assistant to Archbishop Kenrick, thereby clearly showing that the land was bought with funds contributed by the parish. Afterwards, with means raised by the parish, he erected a building on these lots, which was used partly for a school and partly for a church. Thereafter, he purchased lots 12, 13 and 14, taking the title in his own name. On these lots he erected, in like manner, a house for the Sisters who taught

the parochial school. Later he bought, in like manner, lots 2, 3, 4 and 5, taking the title in his own name, and erected thereon, at a cost of $5,000, a two-story brick residence for the pastor. About 1885 he purchased four acres of ground lying immediately south of the property previously acquired, of which the lots 21, 22, 23, 26 and the strip lying east of lot 23, were a part, as were also lots 24 and 25, at and for the price of $12,000, and took the title in his own name. The cash payment was $4,000. In order to raise this he induced Archbishop Kenrick to mortgage lots 6 to 11 for $2,500, and he mortgaged lots 12 to 14 for $1,500. The balance of $8,000 was secured by a mortgage on the four acres. Thereafter, he divided the four acres into lots and sold all, except lots 21 to 26, for some $17,000, and out of this sum he paid the $8,000, the deferred payment, with interest, but he did not pay the $2,500 mortgage on lots 6 to 11, nor the $1,500 mortgage on lots 12 to 14, and never paid either mortgage. He says he used the balance of the $17,000 to pay parish debts, but was unable to specify the amounts thereof or the persons to whom he paid the money, as he kept no books. In 1890 he, with three other men with whom he was interested in mining speculations, executed a note for $6,000 and negotiated it to the Lafayette Bank. When this note fell due he took it up by giving his own note secured by deed of trust on lots 2, 3, 4, 5, 12, 13, 14, 21, 22, 23, 24, 25 and 26. He afterwards paid off a part thereof and had the deed of trust released as to lots 2, 3, 4, 5, 24, 25 and 26 and left the balance of said indebtedness, amounting to $2,153, as a lien on lots 12, 13, 14, 21, 22 and 23, and this balance he never paid.

From the foregoing statement it plainly appears that twenty-five hundred dollars of the purchase price for the four acres (including lots 21, 22, 23 and 26, here in dispute) was contributed by the parish, and this exceeds in amount the value of the lots in controversy. There was, therefore, a resulting trust in favor of the parish to that amount in the four acres,

even if we regard the transaction as to the four acres as Busch's and not his as trustee for the parish. In addition to this, the lots in controversy remained subject to their proportionate part of the balance of the mortgage, to-wit, $2,153, which was ascertained and adjudged, in a suit in equity between the church and the plaintiff, to be $435.75, and the church paid that amount. So that when Busch conveyed the premises in dispute to the archbishop in 1892, he was indebted to the church in, at least, the sum of $5,088.75, a sum in excess of the value of the premises conveyed. As between Busch and the church, therefore, the conveyance was not only supported by a full consideration, but Busch was in reality only transferring the title to the beneficial owner.

But plaintiff argues that while this may be true as between Busch and the church, still the church is estopped to set up such a claim as against the plaintiff, because the church permitted the title to stand on the records in Busch, and thereby permitted Busch to obtain credit upon the faith of the property. There appear two conclusive answers to this contention: First, the plaintiff raised no such issue in the trial court, and, therefore, can not be advantaged in this court by such matters, but on the contrary took issue with the defendant association's answer, setting up this state of facts by denying their existence and by trying the case in the lower court upon that issue and by insisting, as he still insists here, that Busch acquired all the property in block 3719 with his own means, and that he never owed the church a cent; and, second, because in the equity suit between the plaintiff and the church the plaintiff solemnly averred and conceded that the church owned the lots in question, and that they were only subject to the balance due on the $6,000 mortgage. The plaintiff did not plead the estoppel here relied on in the trial court, and, hence, can not avail himself of it in this court. The case must be treated, therefore, as of the status of the parties as it was presented to the trial court, and, as shown, the record fully supports the de-

fendant's contention that the conveyance from Busch to the archbishop was for a full and valuable consideration. In fact, upon the facts here disclosed, a court of equity would have compelled Busch to execute the conveyance.

## II.

But aside from all this, there is no equity in the plaintiff's bill or claim. He contracted with Busch to build the foundation for a church on lots 24 and 25, and before he had done any substantial part of the work he had constructive notice that the lots in controversy had been transferred by Busch to the archbishop. He completed his contract and obtained a judgment against Busch for $14,010, which was made a special lien on lots 24 and 25. He caused these lots, with the $14,010 he had put on them and the $3,000 put on them by other persons, to be sold under his lien and became the purchaser thereof for the sum of $500. Afterwards, he sold those lots and improvements to the church for $10,000. In addition to this, under his general judgment against Busch he caused to be sold and became the purchaser for $70 of lots 12, 13 and 14, on which was a residence for the Sisters who taught in the parochial school, which were worth $4,000, and also lots 2, 3, 4 and 5, on which was the priest's house, and which were worth $12,000 and incumbered for $7,000, making their net value $5,000. Thus under a judgment for $14,010, he acquired for $500 lots 24 and 25 and sold them to the church for $10,000, and he also acquired lots 12, 13, 14, 2, 3, 4 and 5, with the improvements on them for $70, when they were worth in excess of incumbrances $9,000. Or otherwise stated, his debt and the price he paid for all the lots amounted to $14,580, and he has realized $10,000 cash for the sale of lots 24 and 25 and still owns lots 12, 13 and 14, 2, 3, 4 and 5, which are worth $9,000. At law, he is, of course, entitled to the benefit of the bargain he obtained at the sheriff's sale, and no court court deprive him of it, but when he comes into a court of con-

science and asks, in addition to all this, that the property here in controversy be added to his list of bargains, his attitude does not commend itself to the court and his prayer is without any equity. The same principle that prevents a court of law from taking away the fruits of his bargains, prevents a court of equity from lending him any assistance.

Without considering any of the other points urged by the defendant association, these conclusions result in affirming the judgment of the circuit court. It is so ordered. All concur.