Marian Moore, Edwin Carter v. Genevieve Carter, Linwood H. Carter, Anna I. Jones, Susan S. Ott, and L. M. Crouch, Jr., Trustee, Defendants, Anna I. Jones, Appellant.—No. 40035.—201 S. W. (2d) 923.

Division One, April 21, 1947.

Rehearing Denied, May 12, 1947.

*Will H. Hargus* and *C. E. Groh* for appellant.

354

*Ray L. Shubert, Milligan, Kimberly & Deacy* and *Thomas E. Deacy* for respondents.

356

██ DALTON, C.—Action to partition 378 acres of described land in Cass County, with a cross action in equity to quiet and determine title in defendant Anna I. Jones, who claims the whole title by way of a resulting trust. The trial court found the issues for plaintiffs, and ordered partition. Anna I. Jones has appealed.

Parks Carter died intestate on September 27, 1943, the record owner of the described real estate, subject to a first deed of trust securing unpaid notes for approximately $9,700. Carter was survived by his widow, Anna, now Anna I. Jones, and their four children. The partition action was instituted on May 22, 1945, by two of the children against the other two, the widow, the trustee in the deed of trust, and the beneficiary. The petition alleged that the widow was entitled to dower or could elect to take a child's part; that her interest could be determined by the court; and that there had been no administration on the estate of Parks Carter, deceased. Thereupon, the widow filed her cross action claiming the whole title, but the court found she was only entitled to dower. Whether or not she is entitled to the whole title by way of a resulting trust is the essential issue presented by the appeal.

Parks Carter and appellant were married in 1910. At that time they had little property and owned no real estate. Subsequently, Parks Carter acquired two tracts of land, the home place consisting of 65 acres and another tract containing 313 acres, and title was taken in his own name. There was some evidence that the property represented joint accumulation by husband and wife, and that Carter subsequently deeded the 65 acre tract to his wife, but the deed was not recorded, nor produced at the trial.

Thereafter, Parks Carter became heavily involved financially. The 313 acre tract was subject to a first deed of trust securing notes of approximately $9,000, and to a second deed of trust securing notes for $3,500. The 65 acre tract was subject to a deed of trust securing a note for $3,378.95. Parks Carter was further indebted to numerous other parties and his obligations, exclusive of his obligation on secured notes, exceeded $30,000. On February 14, 1934, Carter and his wife transferred both tracts of real estate to L. W. Rodekohr, a single person, who immediately on the same date reconveyed to Parks Carter and Anna Carter, his wife.

██ On December 12, 1938, Susan S. Ott, the holder of the notes secured by the first deed of trust on the 313 acre tract, caused the same to be foreclosed and she bought the property in at the trustee's sale. On December 15, 1938, she entered into a contract with Parks Carter and Anna Carter whereby they agreed to repurchase the tract and Mrs. Ott agreed to refinance their indebtedness to her, but they were to include the 65 acre tract as additional security. The contract provided that her conveyance was to be made to them, "or to whomever they may direct." On September 18, 1939, and before any action had

been taken to carry out the repurchase agreement, Parks Carter filed a petition in bankruptcy and he was, subsequently, on December 5, 1939, fully discharged in bankruptcy. On December 27, 1939, Parks Carter and Anna Carter, by written directions endorsed on the repurchase contract, directed that the 313 acres be conveyed by Mrs. Ott to George W. Carter. The reason for designating George W. Carter, as grantee, rather than Parks Carter and Anna Carter was that the attorney for Mrs. Ott was fearful that the lien of the former second deed might be revived and be superior to the lien of the proposed deed of trust to secure the refinanced indebtedness to Mrs. Ott. About the same time, the deed of trust held by George W. Carter on the 65 acre tract was satisfied of record and Parks Carter and Anna Carter conveyed this tract to him. George W. Carter, thereupon, executed and delivered to Susan S. Ott notes for approximately $9,700 and secured the notes by a first deed of trust on all of the described real estate. It is admitted that this deed of trust constitutes a valid first lien on the described property, and there was evidence that the notes and deed of trust were made at the direction of Parks Carter and Anna Carter, who orally agreed to hold George W. Carter harmless on the notes.

When the forms for the notes and deed of trust to Mrs. Ott had been prepared for George W. Carter to sign, they were mailed by the attorney for Parks Carter and Anna Carter to Parks Carter at Strasburg, Missouri, together with a form of warranty deed for George W. Carter to reconvey the entire 378 acre tract to Parks Carter and Anna Carter, as husband and wife, subject to incumbrances.

On January 2, 1940, when the deed of trust and notes to Mrs. Ott were executed by George W. Carter, the warranty deed form was changed in the office of the attorney for Parks Carter and Anna Carter, at Harrisonville, from the indicated grantees, Parks Carter and Anna Carter, as husband and wife, to Parks Carter, and the deed was, thereupon, duly executed and delivered by George W. Carter. The attorney who made the change in the deed had represented both Parks Carter and Anna Carter over a long period of time "in connection with all matters concerning this farm land since the year 1938." The warranty deed was not recorded in the Recorder's office until August of 1940. Appellant produced the deed after the present suit was instituted and the erasures appear thereon. At the time the deed form was changed, two suits on notes were pending in the circuit court of Cass County against Anna Carter (appellant), and she was represented therein by the attorney, who made the change in the deed. These suits had been instituted in November, 1938, but, after the conveyance of the real estate to Parks Carter, on January 2, 1940, the suits were dismissed, May 18, 1940. The suits were reinstituted against appellant on June 26 and 27, 1945, and later settled, although still pending at the time of the trial.

There is much conflict in the oral testimony concerning the facts and circumstances attending the changing of the proposed grantees in the George W. Carter deed, as well as concerning other pertinent facts occurring subsequent thereto. Appellant, her attorney, his stenographer, and his office associate (the latter participated in the trial by handling the direct examination of the attorney) testified positively that appellant did not accompany Parks Carter and George W. Carter to the attorney's office in Harrisonville, when the form of the deed was changed to Parks Carter as sole grantee. Appellant admitted having seen the deed forms, but denied that she knew of or consented to the change of grantees to Parks Carter. Appellant's attorney testified that the change in the deed form was made by his stenographer at his and Parks Carter's direction; and that he (the attorney) did not consult appellant, who was then his client not only as to matters connected with the farm, but also in the pending actions on the notes. The attorney further testified that on the particular occasion, when the change was made, "Parks Carter called concerning the liability of his wife on notes on which she had been co-maker"; and that Parks Carter "inquired about the advisability of her taking bankruptcy," "whether or not an estate by the entirety would be created on this conveyance from George W. Carter to Anna and Parks Carter," "whether or not her interest in this land could be reached in the way it was being reconveyed," and whether "if Mrs. Carter was in the process of taking bankruptcy . . . that would" interfere with a sale of the property, if a sale was desired. The attorney admitted having discussed these matters with Parks Carter before the form of the deed was changed. The parties then knew that Parks Carter had been discharged in bankruptcy; and that appellant was insolvent and considering bankruptcy. The attorney denied that the parties were afraid Parks Carter was going to die and that in such case, if the property was held by the entirety, it would become subject to appellant's debts. In his opening statement to the court, however, the attorney said that Parks Carter "had been a sick man and confined to his home from the spring of 1941 . . ." and that "the last three years of his life he suffeered from sugar diabetes and it was an effort for him to be up and around at all."

There was further evidence, that, after the warranty deed form was changed, the attorney "talked to him (Parks Carter) about the effect of the title in him alone," and told him he would hold the title for himself and wife in the same manner that George W. Carter had held it for them. There was also evidence that neither George W. Carter, nor Parks Carter, had paid any consideration for the exclusive conveyances to them.

In 1941 and after the deed to Parks Carter had been executed and recorded, Parks Carter was quite ill and came to his attorney's office and asked concerning the title to the land in question. The

attorney told him "it was joint" and "upon his death the entire farm would belong to his wife." Appellant also inquired of the attorney, before and after her husband's death, concerning the title and was advised to the same effect. In the summer of 1944, the attorney told Marian Moore, in the presence of appellant, that "the title to the farm was joint and goes to your mother now that your father is dead." He also told appellant and one Yennie that the title was joint, but Yennie checked the records and found the record title to be in Parks Carter. The attorney then refreshed his recollection from his files and the records. Appellant conceded that she learned the true state of the record in the summer of 1944.

In opposition to appellant's claim, George W. Carter testified that he was living with his brother, Parks Carter, on the farm in question, when the letter arrived with the notes and deed of trust and warranty deed forms to be signed. He said that appellant opened the letter (it appears to have been addressed to her hubsand); and that she examined the form of the proposed deed to Parks Carter and herself and said, " 'George, this isn't made out right, it is made out to me, Anna and Parks Carter and I don't want it that way,' and Parks said he didn't want it that way either and Anna says, 'If that is deed to me there are a lot of notes I will have to pay, and I don't want this deeded to me; I want it deeded to Parks.' " All three of the parties then got in an automobile and went to Harrisonville on the following day and called on the attorney. George W. Carter further testified that, when they reached the attorney's office, "We showed him that deed and Anna says, 'that deed isn't made right. I want it made to Parks,' and Parks said the same thing and Anna says, 'unless I take bankruptcy they will take my property to pay those notes,' "; and that, after the change was made, "Anna and Parks read the deed and so did I, and Anna says, 'This is the way I want it fixed.' " The witness further testified, "She wanted it deeded to Parks, she didn't want to have to pay off."

Edwin Parks Carter, age 26, a son of appellant and one of the plaintiff-respondents, ▆▆▆ testified that he recalled the occasion when his father and mother and George W. Carter made the trip to Harrisonville in January, 1940, "to change the deed out of her (appellant's) name"; that, after they returned from Harrisonville, he heard his father and mother discussing the matter; and that they talked about everything being deeded to his father; "they were getting the land out of her name." He testified that appellant asked, if the 65 acres was included "in that deed," and she was advised it was, and that "the notes she had could not touch her under no circumstances." In January, 1945, after Parks Carter's death, Edwin talked to appellant. She refused to go to Probate Court to see about settling up the estate or paying off the mortgage. She said she knew how things were; that nothing could be done until June 4, 1945; that "if there was

an administrator appointed, she would be it"; that there couldn't be anything done until the notes were out-lawed in June, 1945; and that she would not own the farm outright until that date, when "it automatically goes into my name." The evidence shows that the notes executed by appellant and her husband, which were secured by the second deed of trust mentioned above, were dated June 5, 1933, and were due and payable two years after date. Appellant was also a co-maker with her husband on other notes, including one for $2000.00, dated in 1934.

Mrs. Marian Moore, one of the plaintiff-respondents and a married daughter of appellant, testified that in the summer of 1943 her mother said that the farm was left in the father's name due to the fact that the attorney told her "the notes against her would not out-law until June, 1945"; and that, after her father's death, appellant said she could not do a thing about the estate on account of the notes, until June, 1945; that the attorney had said for her to wait until that date; and that she didn't want the estate brought up in Probate Court until the ten years would be up. As stated, it is admitted that no administration proceedings were pending when the partition suit was filed.

In connection with the above testimony it should be noted that appellant's counsel, in this opening statement to the court in referring to appellant's claim to the described property, said: "I advised her that she had title to this through a resulting trust, but that I would not want to bring a quiet title suit to establish the same until some disposition was made of her creditors. I even suggested to her that apparently they were not pursuing their claims and that the Statute of Limitations was running and that it would be foolish to bring a quiet title suit at that time. There was no fraud there, in other words, there was nothing to keep the creditors from filing a suit any day they wanted to." It further appears from the evidence that, while appellant remained in the possession of the property after her husband's death, she made no claim to sole ownership by resulting trust, until after the filing of the partition action in May, 1945.

Appellant recognized that the burden of proof to establish her right to equitable relief rested upon her. She assumed that burden at the trial and was permitted to open and close the case. Appellant contends that Parks Carter at the time of his death held title for the benefit of himself and appellant, as tenants by the entirety, and now that Parks Carter is dead, appellant is the sole owner by resulting trust; that she is entitled to have her rights established in a court of equity; and that the trial court erred in denying relief.

Respondents, on the other hand, contend that every conveyance made, beginning with the placing of the title in the name of Parks Carter and Anna Carter and extending down to the conveyance made to Parks Carter was a part of a fraudulent scheme to defeat any

judgment lien that might be perfected and impressed upon the described property. Respondents insist further that the final conveyance to Parks Carter was made with the knowledge of, in the presence of, and at the direction of appellant for the fraudulent purpose of defeating, hindering and delaying her creditors; that appellant's delay in making application for the appointment of an administrator, while waiting for the statute of limitations to run against her creditors, was for the same purpose; that appellant intentionally and fraudulently waited to assert her claim to ownership until she believed her creditors were barred by limitations; and that upon the record presented appellant is barred from all relief in equity. Respondents also pleaded and now urge the doctrine of laches and the statute of limitations as a bar to appellant's action.

Appellant's contention that the conveyance by George W. Carter to his brother Parks Carter "did not destroy the resulting trust and equitable estate" of appellant and her husband, as tenants by the entirety, is based upon the theory (1) that George W. Carter had no authority to convey without the consent of the equitable owners; (2) that Parks Carter was not a bona fide purchaser for value; (3) that appellant, as one of the equitable owners and tenants by the entirety, did not consent to the transfer as made; (4) that neither appellant's husband, nor her attorney, had any actual or implied authority to consent to the conveyance of her interest in the property to Parks Carter; and (5) that, if appellant's consent was shown, the burden was on respondents to show a valid gift of her interest to her husband or consideration to her for the transfer of her interest in the property. Appellant further takes the position that, if it be true her name was excluded as grantee in the deed because she contemplated going into bankruptcy, or if she consented that her name be excluded from the record title until limitations had barred the claims of her creditors, or if she delayed the administration on the estate for the reasons claimed, or if she "delayed asserting her claims to be the sole owner of the property until June, 1945," she was guilty of no fraud which would bar the relief she seeks in a court of equity. Her theory is that, since title was held as an equitable estate by the entirety, the property was not subject to her debts; that her husband's liability on the notes had been discharged in bankruptcy; and that a conveyance of entirety property, like a conveyance of homestead or exempted property, could not be fraudulent as to the sole creditors of one of the tenants, since the property was not subject to their claims.

Appellant further contends that her silence, if any, after the conveyance to her husband and after the death of her husband was not in fraud of creditors because she did not occupy a fiduciary relationship to them; that she had no duty to disclose the true facts; that the fraud claimed did not exist at the time of the conveyance to Parks

Carter, but was subsequent thereto; that Parks Carter left no personal estate; that the public records had showed title in Parks Carter since August 23, 1940; that "the creditors of Anna Carter had equal means of information as to how the title stood"; that there was no reason for appellant to commence administration on Parks Carter's estate, because "she claimed to own the land through a resulting trust"; that she was entitled to all rents and profits; and that her creditors were not damaged, because they "refiled their suits against her after this action was instituted and their claims . . . had been settled."

We shall dispose of many questions presented by assuming without deciding that Parks Carter and Anna Carter, his wife, were the owners of an equitable estate, as tenants by the entirety in the described real estate on January 2, 1940, when George W. Carter conveyed the property to Parks Carter; and that Parks Carter took and held the legal title during his lifetime for the benefit of himself and wife, as tenants by the entirety. We shall determine whether, under all the facts and circumstances shown by the record, appellant is now entitled to relief in a court of equity to remedy the situation in which she now finds herself.

In view of our assumption, supra, it is immaterial that the court excluded the testimony of P. J. Yennie, Frank Harbison and Genevieve Carter to the effect that Parks Carter, while living and occupying the described real estate, claimed no exclusive ownership, but stated that he held title by joint deed and that his wife would take the property at his death.

There was irreconcilable and directly conflicting verbal testimony before the chancellor on certain fact issues, but there was little conflict concerning happenings subsequent to the death of Parks Carter. On all fact issues, it is the rule to defer to the chancellor's finding because ▮▮▮ of his better opportunity to determine the credibility of the witnesses who personally appeared before him, unless the overwhelming weight of the evidence is contrary to such finding. Steinhoff v. Kinder, (Mo. Sup.), 186 S. W. (2d) 600, 602; Colquitt v. Lowe, (Mo. Sup.), 184 S. W. (2d) 430, 423. In an equity suit, while we do pass upon the weight of the evidence on appeal, we give due deference to the chancellor's findings on the conflicting parol evidence. In this case, after a careful review of the testimony, we have reached the conclusion that in considering the issues now presented we should accept the facts favorable to the chancellor's decree. Viewing the facts favorable to the decree, appellant is barred from equitable relief under what is known as the "clean hands doctrine."

It is the rule that a court of equity will not aid one who comes into court with unclean hands. Stillwell v. Bell, 248 Mo. 61, 65, 154 S. W. 85; Stierlin v. Teschemacher, 333 Mo. 1208, 64 S. W. (2d) 647, 652. A court of equity will look into the very spirit of the

transaction involved and decide for itself whether a cause, otherwise meritorious, is based on such a dishonest purpose as to justify a refusal to entertain a suit involving such a transaction. Seibel v. Higham, 216 Mo. 121, 137, 115 S. W. 987; Leeper v. Kurth, 349 Mo. 938, 163 S. W. (2d) 1031. "Relief is granted in equity only to one who can 'show his own good faith and the equities of his own position.' " Frederich v. Union Electric Light & Power Co., 336 Mo. 1038, 82 S. W. (2d) 79, 85. "The particular iniquity which prevents the pursuit of an equitable remedy on the part of a plaintiff must relate to the particlar matter in hand, must arise out of the transaction which is the subject of the suit." Stegmann v. Weeke, 279 Mo. 131, 214 S. W. 134, 136. But misconduct which will bar an action in equity does not necessarily need to be fraudulent, it is enough that the party seeking relief has been guilty of inequitable conduct in the very matter about which affirmative relief is sought. Fehlig v. Busch, 165 Mo. 144, 170, 65 S. W. 542; 30 C. J. S., Equity, Sec. 95, p. 480.

In this case it appears that appellant knowingly and intentionally had legal title placed in the name of her husband to protect the property from her own creditors. While the property was not then subject to the claims of her sole creditors, it would become sub- ject to their claims in the event that her husband should predecease her. The husband did in fact predecease her. We may consider appellant's motives at the time of the conveyance to her husband in so far as they throw light upon her conduct subsequent to her husband's death. After the death of her husband, appellant intentionally permitted the record to continue to show ownership in her husband's name while waiting for the claims of her creditors to be barred by the statute of limitations. Her purpose in keeping her ownership hidden and covered up was to hinder, delay and defraud creditors. Appellant did not seek relief in a court of equity, either before or after her husband's death, until forced to do so by the filing of the present action in partition. The parties agree that she first asserted her claim in June, 1945. Her motives in waiting clearly appear. She purposely delayed making claim to sole ownership of the property by resulting trust in order to be able to dispose of creditors. That her fears were well founded appears from the record. After the conveyance to Parks Carter, two creditors dismissed their suits, but five years later, and after appellant made claim to sole ownership of the property, the two creditors refiled their suits. While their claims were settled, the creditors had in fact been hindered and delayed. The record further shows that appellant was actively attempting to prevent administration upon her husband's estate or any action that would force a disclosure of her position, until her creditors were out of the way. She had obtained the advice of her attorney concerning the importance of disposing of her creditors before seeking to establish her ownership of the property and she was acting upon that advice. A court may, of course, consider

and act upon the statements and admissions of counsel in the trial of a cause and the client is bound thereby. State v. Levy, 262 Mo. 181, 191, 170 S. W. 1114; Wood v. Wells, (Mo. Sup.), 270 S. W. 332, 334.

The record shows such inequitable and reprehensible conduct on the part of appellant with reference to keeping the property hidden from her own creditors, after the death of her husband, that she may not now have the aid of a court of equity to remedy the situation in which she now finds herself.

The judgment is affirmed. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.