Burgess, J.
The plaintiffs, who are a minority of the stockholders and directors of The Rich TTifl Coal Mining Company, a corporation, bring this suit against Edwin Gould, R. M. McDowell and W. P. Coleman, the other directors of said company, and *112 David S. H. Smith, its secretary and treasurer, to remove them from their respective positions on account of mismangement of the business of the company under their charge and control, and for a decree against them individually for money which it is alleged has been misappropriated by them, as officers of said company, for an accounting and the appointment of a receiver for said company.
The suit was begun in Bates county, but the venue was subsequently changed to Lafayette county, where, upon trial had before the court, there was judgment for defendants dismissing plaintiffs’ petition, and for costs. From the judgment, plaintiffs appealed.
The petition in a general way charges the defendants with improperly selling coal cheaper to the Missouri Pacific Railway Company than to other consumers, at a loss to the coal company, and in that way discriminated in favor of said company to the detriment of the defendant corporation; that defendant McDowell was at the time acting as fuel agent for said railroad company, and also general manager of the defendant company; that the railway company owned controlling interests in other coal companies, which, by reason of the facts stated, were permitted to sell coal upon the market at a fair price and good profit, while a large portion of the output of defendant company; was purchased by said railroad company at low prices, and without any profit to the defendant company, that the defendant company, by its codefendants and managers, sold to Havens & Company, of Omaha, Nebraska, coal at ninety-five cents per ton for “run of mine” delivered at Rich Hill, which was less than the market price, and without any profit to said defendant company.
The petition further alleges that it was the custom of the country for railroad companies to put in switches for the coal companies at their own expense, and that *113 the railroad company, through these defendants, wrongfully compelled the defendant company at large expense to put in and pay for the switches from the main track of said railroad at Rich Hill to the coal mines of the defendant company.
The petition also states that Gould, McDowell, and Coleman entered into an illegal and fraudulent contract with said Coleman, who was lessee of a zinc works plant at Rich Hill owned by the Missouri Pacific Railroad Company, by which they agreed to sell and deliver to said Coleman large quantities of slack from said coal mines at a ruinously low rate, to wit, six and one quarter cents per ton, until the slack sold at the contract price amounted to $6,290.74, which is uncollectible by the reason of the insolvency of Coleman.
The petition alleges that the capital stock of defendant company is $500,000 divided into five thousand shares of the par value of $100, each; that plaintiff James A. Hill is the owner of twelve hundred and ninety-two shares of said stock; that plaintiff William S. Hill is the owner of two hundred and forty-five shares; that defendant Gould holds as trustee for the Missouri Pacific Railroad Company three thousand and fifty-two shares, and that defendants McDowell, Coleman, and Smith, own nominally one share each, but which in truth and in fact belong to said railway company; that defendant Smith also holds as trustee for defendant company, four hundred and eight shares of its stock which were paid for by its money.
By way of reply to answer of defendants’ plaintiffs admit that E. H. Brown and J. Gould, the latter as trustee for the Missouri Pacific Railway Company, were promoters of the defendant corporation, but aver that said railroad company, by and through J. Gould as trustee, contracted with said E. H. Brown to or *114 ganize the defendant company, and to pay for snch coal as it received from said company one per cent, per bushel, or twenty-five cents per ton, above the costs of the coal.
The allegations in the petition being put in issue by the answer, in order to entitle plaintiffs to the relief sought the proof must show some fraudulent conduct or mismanagement on the part of defendants Gould, McDowell, Coleman, and Smith, or some of them, with respect of the business affairs of defendant corporation. Said defendants being a majority of the stockholders as well as directors, the law required of them the utmost good faith in their management and control of the corporate property. They stand as trustees for all stockholders, and the law will not permit them to handle or manage the property of the company for personal gain or to acquire an advantage over other stockholders. They can not deal with themselves and for the corporation at the same time, and must account for all moneys made with the property of the corporation. Ward v. Davidson, 89 Mo. 445.
“It often happens that a consolidation, lease, sale, or contract between two corporations is made where the directors of one of the corporations are largely interested in the stock of the other. There then is likely to arise a conflict between interest and duty. Such contracts as these are investigated very closely by the courts. They are not necessarily void and are not constructively fraudulent. But if there is actual fraud, or if there has been an undue advantage taken or an unconscionable bargain made, the court will set it aside. If the transaction is fair, the court will sustain it; if it is unfair, the court will undo it.” Cook, Stock and Stockholders [3 Ed.], sec. 662; see, also, Jesup v. Railroad, 43 Fed. Rep. 483.
*115 McDowell began acting as fuel agent for said railroad company about 1886, but received no compensation for Ms services in that capacity. At the same time he was general manager of the defendant company. He was never at any time connected in any way with the railroad company other than as stated. He was general manager of the coal mines, and as such his capacity has not been called in question. Sylvester W: Kribben, general sales agent of the coal company, directed the sales of the coal, and made the contracts with McDowell’s approval. One Kerrigan was superintendent of the railroad company, but refused to take the coal of defendant company under the contract entered into between Brown and J. Grould as trustee. McDowell, in behalf of said coal company, then agreed with Kerrigan to furnish to said railroad company “run of mine coal” at the price of $1 per ton, and $1.10 per ton for “lump coal.”
During all the time that coal was being furnished by defendant company to the railroad company under this contract, plaintiffs had full knowledge thereof and of the terms and conditions of the contract, as well, also, as that defendant Grould was one of the directors of said railroad company, and took no legal steps to cancel the contract, or to prevent its continuation, until the commencement of this action.
Although plaintiffs complain that coal was sold to the railroad company too cheaply, the evidence is conclusive that it was sold for the best price that it would command. It is true that there had been a great decrease since the first of January, 1889, in the net amount of profits arising from the sales of coal of defendant company, which plaintiffs claim is because of the low prices at which its commercial coal was sold, and because the railroad company got sixty per cent. *116 of its output at ruinous prices and at a loss to the coal company. But this is explained when it is • considered that the Rich Hill coal is of an inferior quality, does not command the prices of other coals used for generating steam, the mild winters, and the great-production over demand, as compared with former years. Not only this, but McDowell testified that there was no market for the kind and quality of coal sold to the railroad company; that he could not have sold it to anyone else, and that said company took it the year round.
On this branch of the case our conclusion is that the transactions in regard to the sale of coal by defendant company to the railroad company were entirely fair, and free from fraud.
Another contention is that the railway company, contrary to the custom of the country, compelled the defendant company to pay for its switches from the main track of the railroad to the coal mines. This was clearly a matter of contract which could not in any way be controlled by custom, but even if it could, the evidence shows that no such- custom existed at the time the switches were put in.
A further contention is that McDowell, general manager of the defendant company, sold coalto Havens & Company, of Omaha, at ninety-five cents per ton for ‘ ‘run of mine coal, ’r which was less than its market value. The only evidence upon this point showed conclusively that the price paid by those parties was the full market price, and that it had to be sold at that price to get it in the market there. It seems .that there was a great deal of coal from different mines on the market in that city, and that the Rich Hill coal had to be sold' at those figures in order to compete with other companies. It is not contended, however, that the transactions between McDowell and Havens & Company were tainted with *117 fraud or that McDowell derived any pecuniary benefit therefrom.
A still further contention is that slack coal was sold to the defendant Coleman, who was the lessee of the Rich Hill Zinc Smelter, a plant owned by the railroad company, at six and one fourth cents per ton, which was less than its market value. This coal seems to have been of little value, being sometimes used for ballast, at other times thrown away, and again, at other times, sold for as little as one dollar per car. There was little demand for it, and with respect thereto one of the plaintiffs, James A. Hill, testified as follows:
“Q. Was there a contract made in 1889 in respect to the coal furnished by the Rich Hill Coal Mining Company to the Southwest Lead & Zinc Company? A. I don’t think it was made in 1891; I don’t recollect when.
“Q. ’81, I believe? A. Oh, originally; yes, sir.
UQ. You know of that contract? A. Yes, sir.
“Q. And coal was furnished them under that contract? A. Yes, sir; at six and a fourth cents per ton.
UQ. For slack coal? A. Yes, sir.
“Q. How long was that contract to run? A. For ten years.
“Q. For ten years? A. Yes, sir; I believe that was it.
UQ. Well, when would it expire? A. It would have expired in 1891, I presume.
“Q. That is the same price that it charges now, that has been made to Coleman, was it? A. Yes, sir; the same price.
“Q. The same price? A. Yes, sir; the same price.”
It would seem from the evidence, and as especially from that of this witness, that there was no misman *118 agement, fraud, or injury with, respect to the transaction with Coleman.
The contract between Brown and J. Glould, entered into before theMissouri Pacific Railroad was constructed from Pleasant Hill to Rich Hill, by which Q-ould, as trustee for said railway company, agreed to pay for whatever coal it received at the rate of twenty-five cents per ton profit to defendant company, was never observed by the railroad company, and, while this is not controverted by plaintiffs they contend, that, even if the contract should be held to be of no force, it should be considered as evidence tending to show what defendants and their predecessors thought was a fair profit on the coal they bought.
A corporation is not bound by the contracts of its promoters, unless so provided by its charter, or by ratification, or express provision after it becomes incorporated, or where it has, knowing its terms and conditions, received some benefit from it. 4 Am. & Eng. Encyclopedia of Law, 201, sec. 9. Munson v. Railroad, 103 N. Y. 58. Nor do we think it of any importance as a matter of evidence, even if admissible as such, which is unnecessary to decide.
There seems to have been an entire absence of fraud upon the part of defendants, or either of them, or any expectation of any profit or advantage from their management of the affairs of defendant company, other than that from which all its stockholders would share equally and without partiality or favor, and in the absence of fraud or misconduct, from which they expected to, or did in fact, derive some unfair advantage, a court of equity will not interfere and wrest from their control the management of the company and place it in the hands of a receiver. Citizens Building Association v. Coriell, 34 N. J. Eq. 392.
*119 It follows from what has been, said that the judgment should be affirmed, and it is so ordered.
All of this division concur.