**OHIO FARMERS CO-OP MILK ASSN v CLOVER MEADOW CREAMERY CO et**
(2 cases)

Ohio Appeals, 8th Dist, Cuyahoga Co

Nos 13971 & 13990. Decided Dec 10, 1934

Squire, Sanders & Dempsey, Cleveland, for Ohio Farmers Cooperative Milk Assn.

Oviatt & Oviatt, for Clover Meadow Creamery Company.

Sidney N. Weitz, Cleveland, and J. C. Fisher, Cleveland, for Begg.

SHERICK, PJ, LEMERT and MONTGOMERY, JJ, (5th Dist) sitting.

## OPINION

By SHERICK, PJ.

This cause was originally begun in the trial court as a suit in foreclosure and to marshall liens. As a bar to the Milk Association's right to recovery of relief sought, the defendant Creamery Company pleaded a set-off, and this issue alone was submitted to a jury which returned a verdict and which recognized and established the Creamery Company's right thereto. From this verdict and the judgment entered thereon the Milk Association prosecutes error. It also appeals from the decree entered which determined the equities of the case. The causes were submitted together, and this court will likewise dispose of the issues made in one opinion. The principal error or question made, concerns the right of the Creamery Company to its claimed set-off. This raises the query as to whether or not the Milk Association's motion for a directed verdict should have been sustained. If it should have been sustained, then the many other errors complained of in the law portion of this case become immaterial, and the judgment or decree of the trial court should have been otherwise.

We shall, therefore, proceed to consider the Creamery Company's right to a set-off. And we shall refer to only such portion of the voluminous facts as are imperative to

state our theory of the whole matter, and the law controlling herein.

The Creamery Company claims that the officers of The Ohio Farmers Cooperative Milk Association, the appellant's prede- ·cessor, now a bankrupt, who thereafter became the officers and directors of the appellant, and who on February 16, 1931, by virtue of the appellant's ownership of fifty-one percent (51%) of the voting stock of the Creamery Company, obtained directorate control of the Creamery Company which they held until July 26, 1933; and that they, together with one Smith, who, on April 27, 1931, was appointed as operating receiver of the Milk Association by the Federal Court, and who became a director of the Creamery Company, on February 16, 1932; and that by means of this appointment and interlocking directorship an understanding or plan of price fixing for the sale of milk sold by the Milk Association and its receiver to the Creamery Company from February 1, 1931 to April 27, 1933, when the receivership of The Service Company, the sales agency of The Milk Association, was terminated, was pursued which overcharged the Creamery Company in the sum of $90,679.00 for milk sold to it, and that by this practice it had been defrauded in the sum named and which it claimed as a set-off. It is also stated that Begg as trustee in bankruptcy, appointed January 27, 1933, pursued this same understanding of sale price fixing for milk sold to the Creamery Company until the end of April, 1933. It also appears that the March, 1931, directorate of the Creamery Company· that is its interlocking majority, fixed the milk sales price for February of 1931. The fact further is disclosed that on May 13, 1933, the trustee sold the certain claims and assets sued upon to the appellant, and that after control of Creamery Company had been turned back to its minority stockholders on July 26, 1933, this action was begun. The claim is made that the entire matter was a pre-conceived scheme to defraud and wreck the Creamery Company at the expense of its minority stockholders.

We further note from the record that Mr. Oviatt. of counsel for the Creamery Company was a director of Creamery Company and that after February 16, 1931, he was one of two of the directors of Creamery Company who represented the minority stockholders of that company. We also learn from the minutes of the directors meeting of Creamery Company, under date of May 25, 1932, that he objected to the price fixing charge made against his company for milk sold to it by the receiver of the appellant. His proposed legislation threat and his statements in open court indicate his knowledge and that of his minority associate of the wrong then being done his company or its minority stockholders. It further appears that this was not the first over-charge of which his company complained against the bankrupt; for we note that Mr. Oviatt represented his company in the latter part of 1931 in an arbitration of a like prior claim. It must, therefore, be considered as established that Creamery Company's minority directors and stockholders had a continuing knowledge of the practice and over-charge which is not the basis of their or its present claim to right of set-off. The fact is of interest that the arbitration award, which in part took the form of notes in an approximate sum of $45,000 issued by the Creamery Company to the bankrupt and placed in judgment by the trustee, Begg, and sold and assigned by him as trustee to the appellant with reservations, is one of the claims of .the appellant sued upon in this suit.

Mr. Oviatt, as counsel for his company, says that at no time was Creamery Company, or rather were the minority stockholders, able to prove their claim or any portion thereof as a claim against the bankrupt's estate within the time designated for proving the same, and that it has by the present claimed right to set-off asserted its demand at the earliest available opportunity. The appellant, however, among its other defenses, maintains that the Creamery Company knowingly permitted the price-fixing practice, which it now says was fraudulent, to go on, and that it or their act and conduct with respect thereto now estops it from the assertion of a right to set-off.

Assuming as Creamery Company now contends, that the interlocking directors and the receiver were guilty of an actual fraud as against it, that is to dispoil and wreck it by overcharging and by vexatious suits, and final forced sale and dissolution of the company, we perceive that a vicious plan of ultimate destruction was being carried forward. As if this was the true state of affairs, the minority stockholders might have had the aid of a court of equity. Thompson on Corporations, 2nd Edition, Volume 4, §4507, recites the well recognized rule that:

"Minority stockholders may always have the aid of courts of equity in cases where he sufficiently establishes fraud on the part of the officers or directors."

The same authority in §4511 states a further rule, wherein it is said, that:

"A minority stockholder may waive his right to question the acts of the officers or majority stockholders. He may do this on the principle of estoppel by participation, consent or acquiescence. He may likewise lose these rights by laches. Where the act of a majority is an act that will be valid if ratified by all the stockholders, a stockholder may estop himself to raise the question of the lack of power by delay, with knowledge, for such a time as would be equivalent to ratification."

Numerous cases are therein cited which fully support this rule. Others are to be found noted to the same section appearing in the 1922 Cumulative Supplement to that work.

If the claimed fraudulent practices were being pursued by the interlocking directorate; and the federal receiver as such, or as a director, was participating therein; and all of which was known to the minority directors and stockholders of Creamery Company, then we perceive no good and adequate reason why they then should not at once have proceeded in a court of equity to stop the fraud and looting of which they now complain. Surely no court of chancery, federal or state, would have turned a deaf ear to such a charge and proof of actual fraud.

It was the duty of the minority to then protect Creamery Company's interest. They could have made demand upon the majority directorate of Creamery Company to seek the removal of the receiver, and it failing, then the minority on behalf of and for the benefit of Creamery Company could have made such request of the federal court. If all is true of the receiver as Creamery Company now says or was then able to say, surely no court would have permitted its officer to continue in office or to further perpetrate the fraud proved.

It is said by Creamery Company that because of the antagonist majority of its board of directors, that the company could not have proved its claim in the bankruptcy court within the time prescribed. No effort was made toward that end. We see no reason why the procedure indicated in the next preceding paragraph was not resorted to and its then present claim be approved or disallowed. Had it been approved, Creamery Company would have received its pro rata distribution out of the assets of the bankrupt, but purposely failing in that it now seeks by its set-off to procure allowance in full of its claimed demand from the trustee's assignee. The minority directors and stockholders of Creamery Company, by their failure to act and seeming acquiescence, lead the appellant to believe that no set-off existed as against the bankrupt claims assigned to it. In good conscience it should not now be permitted to assert such.

It is of further importance to remember that Creamery Company, by assertion of its set-off, disregards the tort feature of its case in one respect, in that it connects up the three periods of over-charging upon the theory of an implied contract existing between the officers of the interlocking directorates with the receiver's connivance and the trustees' continuance thereof. It it recognized that receivers and trustees are not bound to accept a contract disadvantageous to the bankrupt estate. It is, therefore, apparent that they must determine if a contract be advantageous or not, and if so, the appointing court may order its continuance. It is, therefore, of further significance that the Creamery Company minority made no move or effort to bring the attention of the court to the facts which might or should have advised the court that this particular implied contract was fraudulent.

Hill v Gould, 129 Mo. 106, 30 SW 181, is authority for holding that contracts made by directors of one corporation with another corporation in which they are largely interested, or in which they or their corporation own a majority of the stock, are neither void nor constructively fraudulent; and that courts will grant relief to minority stockholders if there is actual fraud. If the implied contract in this matter was fraudulent, that fact should have been presented to the court.

The Act of Congress dated March 3, 1887 as amended August 13, 1888, now known as Judicial Code §66 provides:

"That every receiver or manager of any property appointed by any court of the United States may be sued in respect to any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver or manager was ap-

pointed; but such suit shall be subject to the general equity jurisdiction of the court in which such receiver or manager was appointed, so far as the same shall be necessary to the ends of justice."

The note appearing in 29 A.L.R. 1467, considers this statute and digests many adjudications which distinctly hold that under Jud. Code, §66, the right exists to sue a federal receiver in a state court without leave. And turning to Collier in Bankruptcy, 15th Edition, Vol. 1, page 79, wherein comment is made upon In Re Roberts, C. C.A., 2nd Cir., 22 Am. BR 908, 169 Fed. 1022, it is said:

"The Judicial Code (§66) provides in substance that a receiver appointed in a federal court may be sued without leave of the court 'in respect to any act or transaction of his in carrying on the business connected with' the property in his charge. It has been held that this provision applies to receivers appointed in bankruptcy proceedings as well as other Federal receivers."

See also, In Re: Kalb & Berger Mfg. Co., 165 Fed. 895.

And we find it further stated in 23 R.C. L. 128, §136, citing Grant v Buckner, 172 U. S. 232, 43 U. S. (L. Ed.) 430, as authority, that:

"A counter-claim, or set-off, comes within the spirit of the act which permits the receiver of a federal court to be sued without leave, and gives a defendant sued by such a receiver, in a state court, the right to plead a set-off against him in that court."

And further commenting on the facts appearing, we find, that when the trustee caused the Creamery Company notes, which were given in January of 1932, to be placed in judgment, and which was assigned to the appellant and alleged by it as one of its causes of action herein, the Creamery Company minority made no effort to open up this judgment and be let in to defend with its set-off.

It is the conclusion of this court that Creamery Company, by reason of its passive participation, and seeming acquiescence, and by reason of its minority failing to act when it should have acted, and its knowledge at all times seemingly possessed, has been guilty of laches, and by its delay which is equivalent to ratification, is now estopped to assert its claimed set-off. The court should have sustained the plaintiff's repeated motions for a directed verdict. And the judgment entered, from which error is prosecuted in case No. 13990, is reversed and final judgment is entered for the plaintiff in error.

It is the decree of this court, in case No. 13971, that the appellant is entitled to the relief prayed for in its Third and Fourth Causes of Action, subject to the reservation of Trustee Begg in the judgment sued upon and which is set up in the third cause of action. The mortgage sued upon in the second cause of action is ordered cancelled. A decree may be drawn accordingly. Exceptions are saved to all parties.

LEMERT and MONTGOMERY, JJ, concur.