HYDE PARK AMUSEMENT COMPANY, a Corporation, Appellant, v. ADELE MOGLER, MOGLER AMUSEMENT COMPANY, a Corporation, MARGUERITE A. KAIMANN, WILLIAM S. KAIMANN, MILDRED H. KAIMANN, ARLINE J. KAIMANN, and KAIMANN AMUSEMENT COMPANY, a Corporation, Respondents.—No. 40679.—214 S. W. (2d) 541.

Division One, November 8, 1948.

*Paul M. Gerwitz, Jr., Donald Durbin, Francis R. Stout* and *Richard M. Stout* for appellant.

*Carl M. Dubinsky, Dubinsky & Duggan* and *Joseph Nessenfeld* for respondents.

338

[541] BRADLEY, C.—Action for a declaratory judgment to the effect that whatever title or interest defendants (respondents) have in a theater [542] building and certain personal property equipment therein at 1929 Bremen Avenue, St. Louis, is held in trust for plaintiff (appellant) and is in law the property of appellant. The trial court found for respondents; held that the property, both real and personal, was the property of respondent Kaimann Amusement Company and that appellant had no interest therein.

Respondent Adele Mogler, prior to July 20, 1946, owned the theater lot and building thereon and the Mogler Amusement Company owned the equipment therein. Appellant, by its manager, Clarence H. Kaimann, operated a motion picture show in the building which was known as the Bremen Theater. Clarence and respondent Marguerite A. Kaimann owned a 10 year lease, given by respondent Adele Mogler, on the theater building and equipment, which lease expired July 31,

1946. The lessees named in the lease were Clarence II. Kaimann and his brother, William J. Kaimann. William died and his widow, respondent Marguerite A. Kaimann, became the owner of her husband's half interest in the lease. Clarence and William owned equally all the stock in appellant corporation and when William died his widow, Marguerite, became the owner of her husband's stock. Appellant paid the rental on the building and equipment, but the lease was not assigned to it. Clarence was president, director, and as stated, manager of appellant corporation. Marguerite was a director, vice president, and secretary. During the lifetime of William some trouble arose between him and Clarence. It seems that William made some effort to kill Clarence and thereafter committed suicide. After William's death the inference would be that all was not harmonious between Clarence and Marguerite.

The plan was for the appellant corporation to either lease for a new term or buy the theater building and equipment from Mrs. Mogler and the Mogler Amusement Company before the lease expired. But Clarence, whose duty it was to secure the new lease for appellant or see about the purchase for appellant, did nothing towards such end when he should, but according to the trial court's finding he endeavored to purchase for himself. The final result was that Marguerite, her son William S., and his wife Mildred, for a consideration of $58,000, purchased the theater building and the equipment therein. This purchase transaction was closed July 20, 1946. The theater lot, the building, and the equipment therein were conveyed to the Kaimann Amusement Company, which was organized after the purchase of the theater property by the respondent Kaimanns. Walter R. Kaimann and Arline J. Kaimann, his wife, respondents, are the son and daughter in law of Marguerite, and are stockholders in the Kaimann Amusement Company, as are Marguerite, William S., and his wife Mildred.

It is alleged in the petition that "Marguerite A. Kaimann is guilty of a breach of her fiduciary duties as a director and officer of plaintiff and in law should be held to have acted in purchasing the property as agent for plaintiff and to hold said real and personal property as trustee for plaintiff." Adele Mogler, Mogler Amusement Company, Marguerite A. Kaimann, and Kaimann Amusement Company, filed separate answers. William S. Kaimann and his wife Mildred, filed separate joint answer as did Walter R. Kaimann and his wife Arline. It was denied that title to the property was held in trust for appellant; and it was denied that appellant was entitled to the property. It was alleged in the answers that neither the board of directors nor the stockholders of appellant corporation authorized the filing of the suit; that appellant's hands were unclean by reason of the alleged conduct of its manager, Clarence, in doing nothing when he should about a new lease or purchase; that he endeavored to

purchase the property for himself and not for appellant. The trial court found that the real party (plaintiff) in interest was Clarence and that the suit was not authorized by the corporation.

There are four questions presented: (1) Is the title to the property in question held in trust for appellant as claimed? (2) Does the evidence support · the trial court's finding that appellant's (Clarence's) hands were unclean? (3) Do the unconsummated intentions of Clarence to purchase the [543] property for himself constitute a defense to appellant's case? and (4) Was there "a conspiracy between Marguerite Kaimann and Mrs. Mogler through their mutual attorney, Murtha Hackett, to defraud Clarence Kaimann and the plaintiff corporation out of a very valuable business", as appellant says?

At the conclusion of the evidence, while discussing the matter of filing briefs and the time therefor, the trial court said: "I don't want to deprive you of the opportunity to write a brief, but I can say to you that this case is largely one that turns on facts and no brief or any amount of research in the law can change those facts. On all of the facts in this case it is not at all a difficult one to decide. I think that quite clearly the preponderance of evidence in this case is with the defendants. I think that quite clearly the plaintiff, at least the plaintiff's president (Clarence) does not come into court with clean hands. I think he shows by his own evidence, by his own testimony and his own admissions that he was trying to do precisely the same thing that he complains of being done here and I think that there is relatively little need for briefs in the situation." Briefs, however, were filed and thereafter the court rendered judgment.

The trial court found that Clarence "devised a plan and scheme whereby he would purchase the property aforementioned from defendant Adele Mogler and the equipment contained therein from the defendant Mogler Amusement Company, a corporation, in the name of a straw party, for his sole and exclusive benefit; that he at all times concealed from defendant Marguerite A. Kaimann his attempts to purchase said property secretly for his own benefit; that he planned and believed that by such purchase he would terminate the interest of defendant Marguerite A. Kaimann and of the plaintiff corporation in said property; that he failed and refused to purchase said property on behalf of the plaintiff corporation; that he performed many overt acts in the course of his attempt to purchase said property and equipment in his own behalf, for the purpose of carrying out his said intention; and that he did not at any time abandon or withdraw from said scheme and plan, nor ever advise Marguerite A. Kaimann of his intention to abandon or withdraw from same, but at all times endeavored to carry it into successful effect."

The officers and directors of a corporation occupy a fiduciary relation to the corporation and to the stockholders; their position is one of trust and they are bound to act with fidelity and subordinate their personal interest to the interest of the corporation should there be a conflict. Southwest Pump & Machinery Co. v. Forslund, 225 Mo. App. 262, 29 S. W. (2d) 165, 1. c. 169; Brooker v. Thompson Trust Co., 254 Mo. 125, 162 S. W. 187; Hill et al. v. Gould et al., 129 Mo. 106, 30 S. W. 181; Keokuk Northern Line Packet Co. v. Davidson, 95 Mo. 467, 8 S. W. 545. Mrs. Mogler was willing to sell the theater building and equipment (she owned practically all the stock in the Mogler Amusement Company) to appellant, and on February 18, 1946, talked (separately to both Clarence and Marguerite about such sale. She first talked to Marguerite who told Mrs. Mogler that she (Mrs. Mogler) would have to talk to Clarence about it because he was the president of plaintiff. Thereafter and on the same night (at the theater) Mrs. Mogler talked to Clarence. This conversation is narrated in appellant's abstract of the evidence as follows:

"When Mr. Kaimann came in he and I talked, but Mrs. Kaimann was not present when I had this conversation with Clarence. I told him that I intended to sell the theater or lease it and I said that I came down to talk to him about it. I told him I tried to get him by phone and I wrote him in October, but he said that he didn't get the letter. I told him that I was down here tonight to get his preference of renewing the lease or purchasing the property. He said, 'I am fed up with this setup; there will be none of that, no renewal of lease. But I am interested in it personally, but don't quote me as saying that.' I told him he would have to get in touch with Mr. Hackett (Mrs. Mogler's attorney), but he told me he would not do business with Mr. Hackett; so I told him that I [544] would send the real estate man, Mr. Phil Deuser, out if he cared to talk to him. He told me that he would talk to Mr. Deuser and I said, 'I will have him get in touch with you.' "

Phil G. Deuser, assessor of St. Louis County, was also in the real estate business. Mrs. Mogler asked Mr. Deuser to contact Clarence with reference to the sale of the Bremen Theater property and Deuser did so in February, shortly after the talk between Clarence and Mrs. Mogler. Mr. Deuser testified: "I told him I would like to talk in regards to buying the Bremen Theater. When I got to his office I told Clarence Kaimann that Mrs. Mogler felt she wanted to give him the preference in buying (for plaintiff) the theater. He told me $45,000 was tops. At that time there was no discussion between the property and the contents, that was to include everything. I told Mr. Kaimann then that I didn't know much about the value of the contents. I did say that I thought that the building ought to bring $50,000. Mr. Kaimann said that he really was not interesed in buy-

ing it for the company (appellant) and if he did (buy) he wanted to buy it in a straw name. It was not mentioned for whom he wanted to buy in a straw name. He left me with the impression he wanted to buy it for himself."

There was other evidence tending to show that Clarence Kaimann sought to buy this property for himself, but it will not be necessary to state all the evidence. Mrs. Mogler, on the same night of her conversation with Clarence, told Marguerite what Clarence said about having no intention of renewing the lease for appellant and about his personal interest in the matter. There was no evidence that Marguerite breached any duty that she owed to appellant corporation as its officer and director. It might be otherwise if third parties were involved, but such is not the case. Marguerite and Clarence were the only ones involved. She was willing and apparently wanted appellant to get a new lease or purchase, and when Mrs. Mogler brought up the subject of lease or sale, she told her to see Clarence who was manager of appellant. There was no duty resting on Marguerite to get the lease renewed or purchase for appellant; that duty rested on Clarence and was specifically brought to his attention at a meeting of the board of directors of appellant in December, 1945, and quite a few times by Marguerite, but his answers were that there was plenty of time. Under the facts we do not think that Marguarite breached any duty that she owed appellant corporation by arranging to purchase the property in question for herself, her son and his wife, and that title is not held in trust for appellant as claimed. 3 Fletcher's Cyc. Corporation Law (Per. Ed.), Sec. 862; Keokuk Northern Line Packet Co. v. Davidson, supra.

Were Clarence's hands unclean within the meaning of the clean hands doctrine of equity? "The clean hands maxim and its cognate maxims operate against conduct which is fraudulent or illegal. The misconduct need not necessarily be of such nature as to be punishable as a crime, or constitute a basis of legal action; it need not be actually fraudulent, or amount to legal fraud. Further, it is not alone fraud or illegality which will prevent a suitor from entering a court of equity. Any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fairminded men will be sufficient to make the hands of appellant unclean. One whose conduct is offensive to the dictates of natural justice will be remediless in a court of equity. Thus relief may be denied for conduct which is unconscionable, inequitable, or the like. Equity will not grant relief at the instance of one who has been wanting in good faith or good conscience or in fair dealing." 30 C. J. S., Equity, Sec. 95, p. 480. "Misconduct which will bar an action in equity does not necessarily need to be fraudulent, it is enough that the party seeking relief has been guilty of inequitable conduct in the very matter about which affirmative relief is sought."

Moore et al. v. Carter et al., 356 Mo. 351, 201 S. W. (2d) 923, l. c. 929.

We think that the record abundantly shows a course of conduct on the part of Clarence that would be condemned and pronounced wrongful by honest and fairminded [545] men; that his conduct as shown by the evidence was wanting in good faith and good conscience. We rule that Clarence's hands were unclean within the meaning of the clean hands doctrine, and that such bars him from the forum of equity. And since he is the real and only party interested in appellant recovering there can be no recovery.

Do the unconsummated intentions of Clarence to purchase the property for himself constitute a defense to appellant's case? Appellant contends that since Clarence did not succeed in buying the property for himself that all of his efforts in that respect would be no defense to appellant's case. In the brief appellant says that "if Clarence Kaimann had any fraudulent intentions, such intentions would not render his hands unclean so long as they were unconsummated." As supporting this contention appellant cites these authorities: Butte Investment Co. v. Bell et al. (Mo. Sup.), 201 S. W. 880; Bante v. Bante Development Co. et al. (Mo. App.), 27 S. W. (2d) 481; Hobbs v. Boatwright et al., 195 Mo. 693, 93 S. W. 934; 30 C. J. S., Equity, Sec. 95, p. 483; 2 Pomeroy's Equity Jurisprudence (5th Ed.), Sec. 399, p. 99; Moxie Nerve Food Co. v. Holland, 141 Fed. 202; Langley et al. v. Devlin, 4 A. L. R. 32, note p. 58.

The Butte v. Bell case, supra, concerned the conveyance of real property in fraud of creditors; it was held [201 S. W., l. c. 886] that "the intent to defraud must be accompanied with an actual conveyance of the property for that purpose." The other cases and authorities cited recognize that in certain situations fraud without injury will not be permitted to defeat justice. But none of the exceptions can have application here. To say that Clarence's failure to purchase for himself cleansed his hands would, we think, run a hundred percent counter to the true purpose of the clean hands doctrine. In 30 C. J. S., Equity, Sec. 95, p. 483, cited by appellant, it is stated that "the fundamental requisite in determining whether a party comes into court with clean hands is the moral intent, and not the actual injury done." We rule that Clarence's failure to purchase for himself did not remove the stains from his hands and thus open the door of equity to appellant in this cause.

There is no evidence at all to support the claim of conspiracy on the part of Marguerite, Mrs. Mogler and Mr. Hackett. It appears that Mr. Hackett represented Marguerite's husband prior to his death; represented the estate and on occasions advised regarding the troubles resulting in the present cause. Some of the occasions when he advised was when Mr. Dubinsky (counsel for respondents) was absent. There is just no evidence at all of any conspiracy. In deal-

ing with the conspiracy complaint in the brief appellant says that "the uncontrollable hatred of Marguerite Kaimann for Clarence" furnished the "motive for her desiring to have the business without him being associated in the matter." There was no evidence of any "uncontrollable hatred" on the part of Marguerite. The record very definitely shows that she wanted Clarence to purchase the property for the corporation, and that she made no effort to purchase for herself and family until after she ascertained that Clarence was not only not trying to purchase for the corporation, but was trying to purchase for himself. There is nothing in the record that even *squints* at the notion of a conspiracy; there is no merit at all in such claim.

The judgment should be affirmed; it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.