**WHALE ART COMPANY, INC.,**
**Plaintiff–Appellant,**

v.

**Charles J. DOCTER,**
**Defendant–Respondent.**

No. 52654.

Missouri Court of Appeals,
E. District,
Division Four.

Nov. 24, 1987.

Motion for Rehearing and/or Transfer
Denied Dec. 31, 1987.

Application to Transfer Denied
Feb. 17, 1988.

**512** ■ ▬▬▬▬▬▬▬▬▬

Richard B. Walsh, Steven A. Ramirez, St. Louis, for plaintiff-appellant.

Richard Shinners, St. Louis, for defendant-respondent.

GRIMM, Judge.

In this court tried case, Whale Art Company, Inc., appeals from the judgments in favor of Charles J. Docter. Whale Art claims that Docter converted dies used in making the 241 tire plugger gun when he disposed of them. Docter, in turn, claims that Whale Art, acting through Donald Webster, wasted and misapplied corporate assets in an oppressive manner within the meaning of § 351.485, RSMo.1986. ·

The appeal raises three issues. The first two are the product of Docter's counterclaim, while the last was asserted in Whale Art's original petition. The first issue is whether the conduct of Webster was oppressive within the meaning of § 351.485 RSMo.1986, and warranted dissolution of the corporation. We hold that Webster's conduct was oppressive because it effectively cut Docter out of any of the workings or profits of the corporation, *Fix v. Fix Material Co.,* 538 S.W.2d 351 (Mo.App. E.D.1976). In addition, we hold that dissolution of the corporation was the proper course of action because there was no evidence that there was a real likelihood of the business continuing as a profitable venture. Second, whether Webster's oppressive conduct resulted in Whale Art's failure to pay Docter a bonus, and whether the payment of such a bonus was warranted under a valid oral agreement between the parties. We hold that failure to pay the bonus was the result of the oppressive conduct and the trial court's decision to order the bonus paid was warranted under § 351.485. In addition, we hold that there was a valid agreement between the parties. Third, whether Docter's disposition of the dies was unauthorized and amounted to a conversion of corporate property. We hold that Docter had inherent authority, as well as the implied consent of Webster, to throw the dies away, and therefore, the disposal of the dies was not conversion. We affirm.

Briefly, the evidence indicates that Whale Art has been in existence as a corporation since 1964, however, it was founded long before that by Webster's grandfather. Docter, who is married to Webster's sister, worked for Whale Art from approximately 1945 through 1984. Webster worked full time for the business from 1950 to 1977; after 1977, Webster worked at Whale Art only on a part-time basis. From 1960 to 1964, the business operated as a partnership, with Webster and Docter each being a 50% partner. When the business was incorporated, Webster was named vice president and received 49% of the stock; Docter was named president and received 49%; and Henry F. Webster, Webster's father, received 2% of the stock. Neither Henry F. Webster, nor his daughter, Virginia Weaver, (who now owns the 2%), have ever been active in the corporation; all either has received from Whale Art is rent for some real estate, which at the time of trial was $400.00 per month. Donald Webster and his sister, Virginia Weaver, have lived together for the past six or seven years.

The major product of the company from the mid 1960's to 1972 was the model 241 tire plugger gun. This gun was bought exclusively by one customer, Kex Products. Docter developed the 241 gun, made the dies for it, and was in charge of its production. In 1972, Kex decided it needed a different kind of tire plugger gun, so Docter invented, obtained a patent, and manufactured the model 220 gun. That gun was in use for six years, but then in 1978, Kex decided to go back to the 241 gun. So, Docter started production on that gun and stopped production on the 220 gun.

Docter was in charge of the shop, as well as production. Webster handled the accounting for the business. In 1977, Webster began working full time for Dow Screw Products, Inc., and devoted much less time to Whale Art. From 1977 through 1984, Docter was the only full-time employee; part-time employees were hired when Docter needed them.

Following the change in 1978 back to the 241 gun, Docter kept the dies for the 220 gun intact. There was one request, in ear-ly 1984, to start up production of the 220 gun. Docter went to Webster with that request, however, Webster rejected it. After that, the 220 gun dies were broken down and parts thereof used in production.

In the first part of 1984, Webster told Docter to clean up the junk in the garage. As part of the clean up, Docter gave the "scrapman" what was left of the 220 gun dies. Webster did not specify what he considered "junk"; he had not seen the dies since 1978.

In the fall of 1984, Webster came to Docter and asked him to produce a sample of the 220 gun. Docter informed Webster that the dies had been thrown out. Webster said nothing further. Thereafter, he had Whale Art institute a suit against Docter for $17,550, the replacement value of the dies. Docter then left his employment at Whale Art.

In early 1985, Webster purchased dies from a manufacturer in Illinois for the 220 gun. He did not discuss his plans to purchase the dies with Docter. However, his sister, Weaver, knew of it and she said it would be fine; this occurred at a "verbal corporate meeting" of which Docter was not informed. Before this, Docter had always made the dies for the corporation. From the time of the purchase until the trial, Whale Art has not had a customer for the 220 gun.

During 1984, Docter was the only full-time person working in the shop, and, in that year, the company reaped more profits than it had in any previous year. Despite this, Webster refused to allow Whale Art to pay Docter a bonus. The company had been paying bonuses on a regular basis since it was incorporated. The corporation's retained earnings increased from $10,987 in 1978 to $157,395 in 1984. Webster stated that the money was being stockpiled to pay to Docter's replacement. However, until the lawsuit in 1984, Docter had not stated any intention of retiring. In addition, no replacement for Docter had been hired.

In 1985 and 1986, the company did not engage in production, the sales figures dropped from $161,000 in 1984 to $45,650 in

1985. Webster has continued to work full time for Dow Screw Products, he has not spent any additional time at Whale Art. However, Webster had Whale Art pay him a $10,000 salary in 1985 and again in 1986, without any apparent authorization of the directors of Whale Art.

The first issue is whether Webster's conduct was oppressive and whether the dissolution of Whale Art was properly ordered. We affirm the trial court's finding that Webster's conduct was oppressive and the company was properly dissolved.

The standard of review of a court tried case is that the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30 (Mo.1976).

On the question as to the dissolution of the corporation, we look first at Section 351.485, RSMo.1986, which states:

1. Courts of equity shall have full power to liquidate the assets and business of a corporation:

(1) Upon the suit of a shareholder when it is made to appear:

. . . . .

(b) That the acts of the director or *those in control of the corporation* are illegal, *oppressive,* or fraudulent [emphasis added].

To authorize a liquidation, a court does not need to find that all three types of acts listed in the statute exist. Oppressive behavior, standing alone, is enough to cause liquidation of a corporation. *Fix v. Fix Material Co.,* 538 S.W.2d 351, 357–358 (Mo. App.E.D.1976).

Allegations of oppressive conduct are analyzed in terms of fiduciary duties owed by directors or controlling shareholders to minority shareholders. *Fix* at 358; *Kirtz v. Grossman,* 463 S.W.2d 541, 544 (Mo.App.E. D.1971). Although controlling shareholders are not fiduciaries in the strict sense, the general concepts of fiduciary law are useful in measuring the conduct of those in control, particularly in the context of a small closely-held corporation. *Fix* at 358.

Here, the first question to decide is whether Webster is in control of the corporation. Webster argues that since both he and Docter own 49% of the corporation, he cannot be in control of the corporation. However, Webster and Weaver have lived together for seven years. In addition, Weaver has acquiesced in the decisions made by her brother. Thus, the trial court could reasonably find that Webster controls 51% of the corporation which effectively makes him a controlling shareholder, and in control of the company. Also, when a shareholder exercises absolute de facto control over a corporation, such actual dominion carries with it a fiduciary responsibility. *See Fletcher, Cyclopedia of the Law of Private Corporations,* § 5811 (Perm.Ed.1982). Webster has exercised de facto control over the corporation in that he has exclusive control over the accounts and sales of the corporation; he decided not to pay Docter a bonus in 1984; and set his own salary at $10,000 per year. Finding that Webster was in control of the corporation and effectively a controlling shareholder, we also find that he had a fiduciary responsibility to Docter.

Did Webster breach his fiduciary duty toward Docter by engaging in oppressive conduct? Oppressive conduct suggests "burdensome, harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealings and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." *Fix* at 358, *citing White v. Perkins,* 213 Va. 129, 189 S.E.2d 315 (1972).

Here, Webster had Whale Art begin stockpiling the corporation earnings in 1978. This action had the effect of denying Docter money he was entitled to. In addition, Webster wasted corporate assets by purchasing dies that are not being used in production; took a $10,000 salary in 1985, and again in 1986; and paid Weaver

$400.00 a month rent in 1985 and 1986 for a building that basically was not used. These actions seem to connote oppressive behavior. In addition, if they are allowed to continue, the assets of the corporation will all wind up in the hands of Webster and Weaver with none of the monies going to Docter. The trial court did not err in ordering the dissolution of Whale Art.

The second issue is whether the trial court could find the requirement to pay a bonus to Docter was mandated by an enforceable agreement.

An oral agreement is enforceable when there is cogent, clear, and convincing evidence that it was a definite and specific agreement. *Grissum v. Reesman,* 505 S.W.2d 81, 85 (Mo.Div. 2 1974); *Nesler v. Reed,* 703 S.W.2d 520, 523 (Mo.App.E.D. 1985). *Grissum* and *Nesler* both dealt specifically with oral partnership agreements, however, the same principles may be applied to oral agreements between shareholders in a small closely held corporation. Here, both Webster and Docter testified that the corporation, in most years since incorporation, paid a bonus to both shareholders, based on the corporations earnings. Until 1978, the corporation's retained earnings were kept very low. In addition, Docter testified that his salary was set with a view toward the year end bonus. This long-term practice indulged in by the two shareholders, who own 98% of the stocks, was sufficient evidence for the trial court to find that there was a specific agreement. Therefore, we find that Webster's refusal to allow Whale Art to pay Docter's 1984 bonus was a breach of an enforceable agreement.

Whale Art argues that even if there was an enforceable oral contract, the agreement cannot be performed within one year and is therefore barred by the statute of frauds § 432.010, RSMo.1986. This argument, however, is without merit. Whale Art failed to plead the affirmative defense of statute of frauds in its answer to Docter's counterclaim. Therefore, that defense cannot be asserted on appeal. An appellant is bound by the theory submitted to the trial court, and is not permitted on appeal to seek new or different relief or to change that theory, *Johnson v. Duensing,* 332 S.W.2d 950, 957 (Mo.banc 1960). Point denied.

Docter asked the trial court not only to liquidate the corporation, but also to make such other remedial orders as the court deemed necessary to equitably adjust the parties' positions. Section 351.485 RSMo. 1986, does not limit a trial court to the remedy of dissolution, but the court may consider other appropriate alternative equitable relief. *Fix v. Fix Material Co., Inc.,* 538 S.W.2d 351, 357 (Mo.App.E.D. 1976); *Kirtz v. Grossman,* 463 S.W.2d 541, 545 (Mo.App.E.D.1971). Having found that Webster had engaged ·in oppressive acts, the trial court had equitable powers to fashion the appropriate relief. Here, the trial court ordered the $10,000 bonus to be paid to Docter. The trial court had the power to grant this type of equitable relief.

Whale Art's last issue is that Docter's discarding of the dies was unauthorized and amounted to a conversion of corporate property. We agree with the trial court's holding that Docter had the authority to discard the property.

Whale Art asserts that Docter had no implied or express authority to dispose of the dies. However, Docter, as president of the corporation, and as the day-to-day manager, was in the best position to decide which dies were useful and which dies were not. Further, the evidence shows that Whale Art had not used those particular dies since 1978 and the dies had in fact been used for parts. Finally, when Docter gave the dies to the scrapman, he was acting pursuant to directions given by Webster to clean out the garage.

Webster, on the other hand, was not involved in the day-to-day operations of the company. He had not seen the 220 gun dies since they stopped producing the 220 gun in 1978. In addition, there were no buyers for the 220 gun for many years and the new 220 gun dies, which Webster had Whale Art purchase in 1984, have gone unused. Therefore, the trial court did not

err in finding that Docter did not convert the 220 dies.

The judgment of the trial court is affirmed.

SIMON, P.J., and CRANDALL, J., concur.