**Stephanie (Younger) WATERS, Respondent,**

v.

**G & B FEEDS, INC., and William Younger, Appellants.**

**No. SD 29745.**

Missouri Court of Appeals,
Southern District,
Division One.

March 4, 2010.

Gary J. Barrett, Hancock, Lane & Barrett, PLLC, Little Rock, for Appellants.

Bryan O. Wade and Ginger K. Gooch, Husch, Blackwell, Sanders, LLP, Springfield, for Respondent.

ROBERT S. BARNEY, Judge.

Appellants G & B Feeds, Inc. ("G & B") and William Younger ("Bill") (collectively "Appellants") appeal the judgment of the trial court which found in favor of Respondent Stephanie Younger Waters ("Respondent") by dissolving G & B and distributing its assets and liabilities per sections 351.494–502.[1] Appellants now raise three points of trial court error.

"Viewed in the light most favorable to the judgment," *Cannon v. Monroe*, 285 S.W.3d 375, 376 (Mo.App.2009), the record reveals G & B was incorporated on August 3, 2001, by Bill and his son, Greg Younger ("Greg").[2] Bill and Greg each owned 500 shares of stock in G & B with Greg co-owning his stock with Respondent. At the organizational meeting of the Board of Directors Greg was appointed President and Bill was appointed Vice–President and "Secretary–Treasurer." It was also determined that Respondent and Greg would loan $60,000.00 to G & B and Bill would do the same. On September 1, 2001, Respondent and Greg wrote a check to G & B in the amount of $70,000.00, a sum which stemmed from Respondent's sale of stock in her own employer, Jack Henry.[3] The Board of Directors determined G & B

would purchase real estate and improvements for the location of its feed operation from Bill for $45,000.00, consisting of a down payment to Bill of $5,000.00 and the execution of a corporate promissory note in his favor in the amount of $40,000.00 payable upon demand at six percent interest per annum, secured by a deed of trust. In September of 2001, G & B also obtained a collateralized $200,000.00 line of credit from Security Bank of Southwest Missouri ("Security Bank"). The individual members of the Board of Directors and Respondent also signed certain guaranty instruments further securing the line of credit.

G & B's By–Laws[4] provided for a shareholders meeting at least annually and the first shareholder meeting of G & B was held on July 1, 2002. At that meeting Greg and Bill were elected as "Directors;" Greg was appointed "President;" and Bill was appointed as "Vice–President, Secretary–Treasurer."

In November of 2003, Greg and Respondent were divorced and upon their divorce Respondent was awarded all of their shares in G & B as part of the divorce settlement such that she owned 50 percent of G & B or 500 shares. After the divorce, Greg had no further involvement with G & B and Bill thereafter assumed full control of the operations of G & B without discussing with Respondent any action taken by him on behalf of G & B.[5] The membership

1. For ease of analysis and factual recitation, we shall refer to several individuals in this matter by their first names. We mean no disrespect in doing so.
All statutory references are to RSMo 2000.

2. Respondent was married to Greg at the time of the creation of G & B.

3. As found by the trial court, Bill did not make his promised $60,000.00 initial cash contribution to G & B.

4. Under "Type of Corporation" the By–Laws provided that "[t]he corporation shall be a

Sub Chapter S Corporation for tax reporting purposes." "Subchapter S is a tax status provided certain corporations under the Internal Revenue Code. Although not completely identical, the tax treatment is substantially like that afforded a partnership." *Thill v. Thill*, 26 S.W.3d 199, 202 n. 1 (Mo.App.2000).

5. G & B's tax returns from 2001 through 2006 identify only Bill as owning 50 percent or more of the stock in G & B.

of the Board of Directors of G & B did not change after Greg ceased involvement with G & B. Indeed, as best we discern the record, despite the requirements of the corporate By–Laws, thereafter no annual or special meetings of the stockholders took place; three members of the Board of Directors were not appointed to manage the business of the corporation; Bill continued in his capacity as Vice–President while acting as President; and no other corporate officers were appointed by any Board of Directors. Furthermore, we have not been presented records showing that salaries had been fixed by the Board of Directors as prescribed by G & B's By–Laws.

On May 23, 2003, Bill refinanced the outstanding balance on loans made by Security Bank to G & B by obtaining $127,000.00 from Cassville Ford Center, Inc. He executed a personal promissory note to Cassville Ford Center, Inc., and secured it by his own farm property. He then executed a corporate promissory note made payable to himself in the amount of $127,000.00. Again, Respondent was not consulted about these transactions.

Thereafter, on behalf of G & B, Bill executed a corporate promissory note in the amount of $50,000.00, in favor of Shirley Blythe ("Ms. Blythe") secured by corporate real property. Again, Respondent was not consulted about this transaction.

On November 26, 2004, Bill also executed a $20,045.00 promissory note on behalf of G & B in favor of Security Bank secured by a skid loader owned by G & B. This was followed on December 31, 2004, by Bill executing a corporate promissory note to himself from G & B for $18,470.00 and subsequently paying himself the same amount with a corporate check denoting the payment was for "payroll." Respondent was not consulted about either of these corporate transactions.

On December 1, 2004, Respondent filed her "Petition for Involuntary Dissolution on Grounds of Deadlock or Oppression" in which she requested judicial dissolution of G & B, pursuant to section 351.494;[6] an accounting of G & B's assets and investments; and dissolution of the corporation due to her exclusion from the business by Bill as well as his "dissipati[on of] corporate and shareholder assets to the detriment of [Respondent]." In August of 2006, Respondent filed her "Motion for Order of Sale ..." in which she requested the real estate and tangible property of G & B be sold. Bill acquiesced in this motion and from August of 2006 to July of 2007, G & B's real estate was listed for sale at the price of $325,000.00. An initial offer to purchase the property for $303,000.00 was rejected by Bill, as was a second offer for the full asking price of $325,000.00, which included the caveat of a non-compete agreement from Bill. Respon-

---

**6.** Section 351.494 states that

[t]he circuit court may dissolve a corporation:

\* \* \*

(2) In a proceeding by a shareholder if it is established that:

(a) The directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally because of the deadlock;

(b) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent;

(c) The shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired; or

(d) The corporate assets are being misapplied or wasted[.]

dent and Bill were unable to reach an agreement regarding the sale of G & B's real and personal property such that on July 3, 2007, Respondent filed a motion for sale of G & B's assets at public auction which was granted by the trial court.

On October 27, 2007, an auction was held and G & B's personal property sold for $20,162.00 for a net profit of $15,744.79 after deductions of auction commissions and costs. The real estate sold for $270,000.00 with settlement charges consisting of $17,842.15. Thereafter, $40,768.23 was paid to Ms. Blythe; $3,437.99 went toward taxes; and $19,880.00 was paid to Security Bank on the loan secured by the skid loader. The remainder of the sale proceeds were deposited into an escrow account pending the trial court's order of distribution.

On May 16, 2008, the trial court entered a judgment dissolving G & B pursuant to section 351.494; ordered Bill to give notice to the various creditors; and required him to compile a final report listing all creditors and debts of G & B. On February 17, 2009, Bill filed his final report in which he listed the following creditor claims: $34,997.13 to Furst–McNess for feed; $1,782.51 to the Internal Revenue Service ("IRS") for the December 31, 2006, tax period; $1,631.06 to the IRS for the July 30, 2007, tax period; $1,382.69 to the IRS for the July 30, 2006, tax period; $40,000.00 to Bill to reimburse him for the sale of his real property to G & B at the time of its incorporation; $98,717.23 to Cassville Ford Credit/Etta Nesbitt; $18,470.00 to Bill for "2004 [s]alary reinvestment;" $41,600.00 to Bill "for 4/27/06 through 10/6/07 wages;" and $1,653.18 to Taylor and Associates f/k/a Angel and Company for 2007 tax return preparation.

Respondent and Bill agreed as to the amounts on the debts to the IRS and Taylor and Associates, but Respondent took issue with the amounts Bill said he was due from G & B.

The trial court's final hearing in this matter was held on February 20, 2009, and on March 24, 2009, it entered its "Findings of Fact, Conclusions of Law and Final Judgment of Judicial Dissolution and Termination of Corporation" ("the Judgment").

In the Judgment, the trial court found, *inter alia*, that in "mid 2003, [Bill] assumed full control of the corporation and operated the business and made all decisions and took all actions for the corporation without seeking any assent or assistance from [Respondent]." It also found Respondent had contributed $79,912.24 to G & B as an initial cash contribution [7] but that Bill failed to make "an initial cash contribution to the corporation." It then ordered that "[t]he $70,000.00 contribution of [Respondent] [constituted] a corporate debt to [be] paid." The trial court then recited a medley of actions taken by Bill which the trial court considered as "acts of shareholder oppression:"

> [h]e assumed control of the corporation and the operation of its business without lawful authority and in complete disregard for the rights of [Respondent]. He borrowed money and refinanced debts on his own without consultation with [Respondent]. He testified that throughout the term of the business he purchased livestock feed at cost for [his] herd of 500–600 head of livestock, a substantial savings over a period of six years. However, the court has no evidence, other than [Bill's] testimony, as

---

7. Apparently Respondent had made an additional loan to G & B in the amount of $9,912.24.

to any such amounts paid for feed. He declined the opportunity to pay [Respondent] $70,000[.00] for her stock, the amount she had paid for it, and thus be in a position to have complete ownership of the corporation and the lawful right to operate the corporation business as he was doing without lawful right. He refused to cooperate in the sale of the business property to the ultimate financial detriment of both shareholders. He retained all rental receipts from the storage units and gave no accounting therefore. He has totally failed to give a proper accounting of his stewardship of the business affairs.

On the other hand, the court takes into consideration the practical fact that the establishment and initial financing of the business was largely based on the credit of [Bill], and the departure of his son from the business required that he become active in the operation of the business. However, it did not require that he treat [Respondent] as a nonentity when, in fact, she was the only shareholder who honored the agreement to make a cash contribution of $60,000[.00], actually paying $70,000[.00].

The trial court then determined the following debts were legitimate debts of G & B which were to be paid from the sums held in escrow: the accrued taxes, interests and penalties in the amount of $4,796.26 owed to the IRS;[8] $1,653.18 payable to Taylor and Associates; $3,014.18 payable to Angel and Company for tax preparation; the bill to Furst–McNess for feed in the amount of $34,535.76;[9] "legal fees and filing fees associated with filing the request for termination pursuant to [s]ection 351.522;" and "$70,000.00 to [Respondent]." The trial court found all other debts claimed by Bill were "not true debts of [G & B] in that they were incurred solely by [Bill] and without any attempt to follow proper corporate procedures and without any consultation with the other owner of a one-half interest in [G & B, Respondent]." As a result, the trial court ordered that whatever funds were remaining after payment of the legitimate debts detailed above would be divided one-half to Respondent and one-half to Bill. This appeal by Appellants followed.[10]

■■■■ " 'Dissolution of a corporation is an equitable action in which jurisdiction is granted by statute.' " *Struckhoff v. Echo Ridge Farm, Inc.*, 833 S.W.2d 463, 466 (Mo.App.1992) (quoting *Fix v. Fix Material Co., Inc.*, 538 S.W.2d 351, 354 (Mo.App. 1976)). "A court of equity is to take jurisdiction of the cause, once the requisite showing is made, and then exercise its discretion in granting or refusing equitable relief." *Id.* "The standard of review in an equitable action is the same as that for any court-tried case: we will sustain the trial court's judgment unless there is no sub-

---

**8.** The trial court noted that additional taxes, penalties, and interest had accrued due to Bill's failure to comply with a previous court order to pay the 2007 taxes.

**9.** The trial court found the Furst–McNess bill should "have been satisfied through proper management of corporate affairs" and it was "a legitimate debt due a third party creditor" such that it should be paid with corporate funds.

**10.** Respondent has filed a "Motion to Strike Appellants' Brief and/or Dismiss Appeal" due to several violations on the part of Appellants in failing to comply with the Missouri Court Rules and this motion has been taken with the case. While we note Appellants failed to comply with certain briefing rules, we are able to ascertain the meaning of their points relied on and their accompanying arguments; and Respondent has fully responded to the points set out by Appellants. As such, we review Appellants' points relied on and accompanying arguments *ex gratia*. Respondent's motion is overruled.

stantial evidence to support it, it is against the weight of the evidence, or it erroneously states or applies the law." *Cannon,* 285 S.W.3d at 381. "We will set aside a judgment or order on the basis that it is against the weight of the evidence only if there is a firm belief that the judgment or order is wrong." *Id.* Further, "[w]e view all of the evidence and the reasonable inferences therefrom in the light most favorable to the judgment and disregard all contrary evidence and inferences" and "[w]e defer to the determination of the trial court on matters of witness credibility." *Id.* "[W]e are bound by the trial court's factual findings if such findings are supported by substantial evidence." *Gibson v. Adams,* 946 S.W.2d 796, 800 (Mo. App.1997).

▇▇ "Dissolution of a corporation is a drastic remedy and courts should resort to this procedure only to prevent irreparable injury, imminent danger of loss or a miscarriage of justice." *Struckhoff,* 833 S.W.2d at 466. "The trial court, before exercising its discretion, should consider the effect the dissolution would have on the public as well as the shareholders." *Id.* "The complaining shareholder has the burden of proof to establish grounds for dissolution." *Churchman v. Kehr,* 836 S.W.2d 473, 482 (Mo.App.1992).

▇▇ In their first point relied on, Appellants maintain the trial court erred in finding Bill "did not make the initial cash contribution because the undisputed evidence before the Court clearly indicates that [Bill] contributed his portion of the investment." Appellants assert there was evidence presented by way of G & B's "Cumulative General Ledger" ("the ledger"), which was prepared by G & B's accountants, showing that Bill contributed $52,652.61 as an initial cash contribution. However, Bill presented little or no supporting documentation showing Bill's con-

tribution. Additionally, on direct examination at trial the following testimony was given by Bill:

> Counsel for Appellants: So what was the total amount [you contributed to G & B while it was in business]?
>
> Bill: The total amount was $30,197.71
>
> Counsel for Appellants: So [although] you didn't put in an initial investment of $65,000[.00] like [Respondent] did, you did pay an investment in the company otherwise, didn't you?
>
> Bill: I did.

However, on cross-examination, when Bill was asked if he had paid "the $60,000[.00] advance that's identified in the Minutes of the Board of Directors' Meeting ...," he unequivocally answered, "No."

"Conflicts in the evidence were for the trial court to resolve, and the facts must be taken in accordance with the result reached." *Thomas v. King,* 160 S.W.3d 445, 450 (Mo.App.2005). As already stated, "[w]e defer to the determination of the trial court on matters of witness credibility." *Cannon,* 285 S.W.3d at 381. Furthermore, we are bound by the trial court's factual determination if they are supported by substantial evidence, which is the situation here. *Gibson,* 946 S.W.2d at 800. The trial court did not err in finding Bill did not make an initial cash contribution to G & B. Point I is denied.

▇▇ In their second point relied on, Appellants assert the trial court erred in finding Bill "assumed control of [G & B] and the operation of the business without lawful authority and in complete disregard for the rights of [Respondent] ..." in that "the corporate documents indicate [Bill] had the authority to conduct the transactions at issue in this matter."

Here, the G & B By–Laws state:

[t]he President shall be the chief executive officer of the Corporation; he shall preside at all meetings of the stockholders and directors; he shall have general and active management of the business of the corporation and shall see that all orders and resolutions of the Board are carried into effect.

He shall sign all stock certificates and execute other instruments on behalf of the Company.

The Vice–President[ ] shall, in the absence or inability of the president, perform the duties of the office and such other duties as the Board may direct.

Appellants maintain that once Greg, the President of G & B, was no longer involved in the affairs of the corporation, Bill as Vice–President had the authority to make any of the decisions Greg had been entitled to make such as executing loan documents and refinancing debts. Accordingly, they argue the trial court erred in finding Bill had no lawful right to disregard Respondent's rights as a shareholder. Appellants' argument fails because the trial court's ruling was not based on Bill's failure to follow corporate formalities [11]—although Bill's actions were egregious and constituted evidence of failure of Bill's fiduciary obligations—the trial court's decision was, instead, based on its finding that Bill had excluded Respondent from the business and committed various acts of shareholder oppression.

The Supreme Court of Missouri has approved of the following statement of law relative to fiduciary obligations of officers and directors of a corporation: " '[t]he officers and directors of a corporation occupy a fiduciary relation to the corporation and to the stockholders; their position is one of trust and they are bound to act with fidelity and subordinate their personal interest to the interest of the corporation should there be a conflict.' " *Johnson v. Duensing*, 351 S.W.2d 27, 32 (Mo. banc 1961) (quoting *Hyde Park Amusement Co. v. Mogler*, 358 Mo. 336, 214 S.W.2d 541, 543 (1948)). Further, "this fiduciary duty requires corporate directors and officers 'to exercise the utmost good faith in the discharge of the duties arising out of their trust, and to act for the corporation and its stockholders, giving all the benefit of their best judgment.' " *Moore v. Moore*, 189 S.W.3d 627, 633 (Mo.App.2006) (quoting *Bromschwig v. Carthage Marble & White Lime Co.*, 334 Mo. 319, 66 S.W.2d 889, 892 (1933)). "Moreover, officers of a closely held corporation[ [12] ] owe a higher degree

11. "Missouri requires corporations to hold regular board of directors meetings" and "also requires an annual shareholders meeting." *Gibson*, 946 S.W.2d at 801. "The statute does *not* permit a waiver of these meetings. The purpose of the annual shareholders' meeting is to elect the board of directors." *Id.* The record is devoid of a showing outside of the first meeting of the Board of Directors on August 3, 2001, that other Board of Director meetings were held; likewise, no annual shareholder meetings were called after July 1, 2002.

12. Here, while G & B was not incorporated as a closely held corporation, pursuant to sections 351.750–351.935, nevertheless, G & B had all the attributes of a closely held corporation. "Our courts have undertaken various definitions of a 'close' corporation." *Forinash v. Daugherty*, 697 S.W.2d 294, 302–03 (Mo.App.1985). For instance, a closely held corporation has been defined as "one in which the stock is owned by comparatively few persons who are active in the management of the company, and the shares are not listed on any exchange or otherwise traded by the public." *Id.* Further, in *Taylor v. Clark*, 140 S.W.3d 242, 253 (Mo.App.2004), this Court noted that the "characteristics of a closely-held corporation in Missouri include: 1.) a small number of shareholders; 2.) the lack of a ready market for the stock; and 3.) substantial participation in business operations by the stockholders." *See Thill*, 26 S.W.3d at 203 n. 3.

of fiduciary duty to shareholders than do their counterparts at public corporations." *Id.*; *see Forinash,* 697 S.W.2d at 302–03.

▆▆▆▆ "To authorize a [judicial] liquidation [of a corporation], a court does not need to find that all three types of acts listed in [section 351.494] exist. Oppressive behavior, standing alone, is enough to cause liquidation of a corporation." *Whale Art Co. v. Docter,* 743 S.W.2d 511, 514 (Mo.App.1987). "The existence of oppression must be determined on a case by case basis" and "[i]n general ... oppression suggests harsh, dishonest or wrongful conduct and a visible departure from the standards of fair dealing." *Struckhoff,* 833 S.W.2d at 467 (internal citation omitted). "Oppressive conduct suggests 'burdensome, harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealings and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.'" *Whale Art,* 743 S.W.2d at 514 (quoting *Fix,* 538 S.W.2d at 358).

In the present matter, the trial court found Bill engaged in oppressive behavior by disregarding Respondent's interests as a shareholder; by operating the business and making decisions on behalf of the corporation without seeking assent or assistance from Respondent; by borrowing money and refinancing debts without Respondent's input or any concern for the effect it would have on her interests; by filing tax returns that identified only himself as owning 50 percent or more of the corporate stock; by feeding his 500–600 cattle with feed from G & B at cost and possibly without even paying for it; by refusing to cooperate in the sale of G & B which ultimately resulted in a much lower selling price than anticipated; by failing to pay taxes to the IRS as ordered and accumulating interest and penalties for G & B based on that failure; and by "totally fail[ing] to give a proper accounting of his stewardship of the business affairs." Such repeated and contumacious behavior was "harsh, dishonest [and] wrongful ... and a visible departure from the standards of fair dealing." *Struckhoff,* 833 S.W.2d at 467.

> Allegations of oppressive conduct are analyzed in terms of fiduciary duties owed by directors or controlling shareholders to minority shareholders. Although controlling shareholders are not fiduciaries in the strict sense, the general concepts of fiduciary law are useful in measuring the conduct of those in control, particularly in the context of a small closely-held corporation.

*Whale Art,* 743 S.W.2d at 514 (internal citations omitted).

Despite Bill's conclusory arguments to the contrary, there is sufficient evidence supporting the trial court's determination that Bill breached his fiduciary duty to Respondent in his dealings with her and in his operation of the affairs of G & B. *Gibson,* 946 S.W.2d at 800; *Cannon,* 285 S.W.3d at 381. We cannot conclude the trial court erred in finding Bill operated G & B without lawful authority while exercising oppressive and wrongful behavior. Point II is denied.

In their third point relied on, Appellants maintain the trial court erred in "finding that certain debts presented to the [trial court] were not proper in that the debts are legitimate debts to help the furtherance of the corporation as well as assist in the initial startup of the corporation."

▆▆▆▆ First, we examine the purported debt to Cassville Ford Center, Inc./Etta Nesbitt in the amount of $98,717.23. This debt was created when Bill refinanced the Security Bank indebtedness to secure a

lower interest rate. This was done in May of 2003. Contrary to the findings of the trial court, we determine that there was a "a clear chain of records" evidencing the fact that Bill took this action on behalf of G & B, despite the fact that Bill failed to follow appropriate corporate protocol in doing so. In our review of the minutes of the first and only meeting of the Board of Directors, held on the August 3, 2001, a "[m]otion was made and seconded to borrow $200,000.00 on a future advances note from the Security Bank. . . ." As best we discern the record, the proceeds of the loan made by Cassville Ford Center, Inc., were used to satisfy the then outstanding balance owed to Security Bank. This balance, or indebtedness made on behalf of G & B, amounted to $98,717.23. We determine the trial court erred in applying the law to the facts with regard to this particular indebtedness. "When equity acquires jurisdiction of a cause it will retain it to do full and complete justice, and may give relief different from that sought by the plaintiff." *Kirtz v. Grossman,* 463 S.W.2d 541, 545 (Mo.App.1971) (employing the predecessor to current section 351.494). Accordingly, we reverse the trial court's finding and judgment relating to this indebtedness and remand the matter so that the trial court may order payment of the indebtedness, including interest to date, to the appropriate party or parties in interest.

▮ Second, we look at the $40,000.00 debt purportedly owed to Bill and observe that it arose from the sale by Bill to G & B of real property owned by him upon which G & B conducted its business. Again, we note that this transaction was expressly approved in the minutes of the first meeting of the Board of Directors, held on August 3, 2001. The terms were $5,000.00 at closing and a $40,000.00 promissory note made payable to Bill at the rate of six

percent interest to be secured by a second deed of trust. The President and the Secretary were authorized to execute any necessary documents to this end. Appellants complain that by the time of the hearing in March of 2008, the balance on this note was $65,000.00 and no payments had ever been made on this note. While this indebtedness constituted a legitimate debt of the corporation, we cannot say that in employing its equitable remedies the trial court erred. Bill failed to contribute his initial $60,000.00 cash contribution to the corporation, hence, this foregoing amount along with a reasonable rate of interest would more than offset any amount that Bill as payee may have been entitled to receive from G & B's unpaid $40,000.00 promissory note.

▮ Third, we scrutinize the $18,470.00 loan that Bill made to G & B when he reinvested his 2004 salary into the company, and fourth, we consider the $41,600.00 which Bill asserts he was owed for his wages from April 27, 2006, through October 6, 2007. While the $18,470.00 loan arose from purported wages owed Bill, and the $41,600.00 constituted wages owed to Bill, it is clear that the By–Laws required a majority of the Board of Directors to approve of any wage or other salary payments. No such formal approval by the Board of Directors was presented at trial. The creation of these purported debts is further evidence of Bill's lack of fair-dealing and oppressive practices relating to the operation of G & B. We defer to the trial court's determination that these were not legitimate debts of G & B. *Gibson,* 946 S.W.2d at 800. Point III is meritorious in part and is denied in part.

That part of the trial court's judgment determining that the indebtedness owed by G & B to Cassville Ford Credit/Etta Nesbitt in the amount of $98,717.23 does not constitute a legitimate debt payable by

G & B is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. In all other respects the judgment of the trial court is affirmed.

BATES, P.J., and BURRELL, J., concur.